BRYANT *et al. v.* BROWN.[*]

(In Banc. Sept. 24, 1928. Suggestion of Error Overruled Oct. 8, 1928.)

[118 So. 184. No. 27191.]

400

*Corpus Juris-Cyc. References: Constitutional Law, 12CJ, p. 937, n. 78; p. 1210, n. 2; p. 1224, n. 21; Infants, 31CJ, p. 989, n. 81; p. 990, n. 93; p. 1101, n. 46; p. 1105, n. 8, 11, 13; p. 1108, n. 96; p. 1109, n. 98; Juries, 35CJ, p. 195, n. 24; Parent and Child, 29Cyc, p. 1587, n. 42; Prisons, 32Cyc, p. 315, n. 2. As to validity of statute establishing juvenile courts, see annotation in 3 L. R. A. (N. S.) 564; 45 L. R. A. (N. S.) 908; 14 R. C. L. 278; 3 R. C. L. Supp. 205 et seq.; 4 R. C. L. Supp. 893.

*Ruth L. Waller* and *D. W. Draughn,* for appellants.

*Rufus Creekmore,* Assistant Attorney-General, for the state.

ETHRIDGE, J. This is an appeal from an order of the chancery court of Forrest county, Mississippi, committing Howard Bryant to the Industrial Training School at Columbia, in this state.

It appears from the record that the said Howard Bryant was, at the time, thirteen years of age, and resided with his parents, Mrs. Lizzie Bryant and Ira W. Bryant, in the city of Hattiesburg. It further appears that, prior to the 9th day of February, 1927, Howard Bryant had

been committed to the said institution by an order of the chancery court on petition setting up that he had violated certain laws and ordinances involving moral turpitude. He remained in the institution for some months, and, on the 21st day of November, 1927, the mother of the said Howard Bryant filed her petition for a writ of *habeas corpus* challenging the legality of the commitment of the said Howard Bryant to the Industrial Training School. There was a hearing on the petition for *habeas corpus,* and, on the 9th day of December, 1927, the chancellor who heard the *habeas corpus,* being the same judge who committed Howard Bryant to the said institution, adjudged the said commitment illegal and void, for the reason, it appears, that the mother, Mrs. Lizzie Bryant, was not given notice of and opportunity to defend the first proceeding to commit.

After this, and on the same day that Howard Bryant was discharged on *habeas corpus,* the appellee, Mrs. Mary B. Brown, a probation officer, filed another petition before the chancellor who had heard the *habeas corpus* for the commitment of the said Howard Bryant. In this petition it was alleged that "the petitioner is such a person as is authorized by chapter 111, Laws of 1916, to file a petition for the confinement of destitute and delinquent children."

It is alleged in the petition that Howard Bryant is a minor, under the age of eighteen years, and lives with or is under the control of his parents, Ira Bryant and Mrs. Lizzie Bryant, resident citizens of Forrest county, Mississippi; that the said minor is delinquent within the meaning of chapter 111, Laws of 1916, for the reason that the general environment of the said child is such that he is likely to develop criminal tendencies unless removed from his present surroundings, and should be adjudged delinquent within the meaning of the said chapter, and committed to the Mississippi Industrial Training School;

that the said minor had committed felonious offenses, involving moral turpitude, and had many times been guilty of misdemeanors, including the violation of city ordinances.

The father and mother of Howard Bryant (his nearest relatives) were made parties defendant to this petition, and petitioner prayed for process to issue as provided by the statute and be made returnable before the chancellor at a time and place designated by him, not less than five days from the issuance thereof, commanding defendants to appear and show cause, if any, why the said minor defendant should not be adjudged delinquent within the meaning of the said statute, and committed to the Mississippi Industrial Training School and the care and custody of the superintendent thereof. The petition was sworn to by the petitioner.

Thereupon the defendants, through their attorney, petitioned the court for a bill of particulars setting forth the crimes, if any, with which they are charged, the time and place of their alleged commission, and the persons present when committed; of all crimes with which the minor defendant, Howard Bryant, is being charged by the complainant, the courts in which he was tried for such offenses, and the judgment of any court which the complainant desires to introduce in evidence, in the trial of this cause.

In answer to the request for a bill of particulars, it was set forth that, on the 27th of November, 1925, Howard Bryant was convicted in the city court upon a charge of petit larceny, being case No. 2183; that on November 8, 1926, the said Howard Bryant was again convicted for petit larceny, as shown by said docket, the same being case No. 8529 upon the city docket; that again, on July 19, 1926, the said Howard Bryant was convicted, in the municipal court of the city of Hattiesburg, upon a charge of being a dangerous and suspicious person, the same being case No. 8960; that in the year 1926, on November 2,

the said Howard Bryant was convicted of petit larceny of certain personal property belonging to Charles De Fatta, the same being case No. 10122; that in the year 1926, the said Howard Bryant was convicted, in the municipal court of the city of Hattiesburg, of being a dangerous and suspicious person, case No. 10152; that in September, 1926, the said Howard Bryant, in company with other boys, "burglariously and feloniously broke into the storehouse of the Polk Hardware Company, a partnership, and from said storehouse took, stole, and carried away" goods and chattels of the value of twenty-five dollars.

The bill was demurred to then by the attorney for the appellant:

(1) On the ground that the petition was insufficient in law, and failed to state any grounds or allegations warranting the confinement of said child in the Industrial Training School;

(2) That the petition is insufficient on its face to maintain and support a decree confining Howard Bryant to the Mississippi Industrial Training School:

(3) That chapter 111, Laws 1916, is unconstitutional, and in strict violation of the personal rights and liberties of the children undertaken to be confined and imprisoned in said Industrial Training School, and of their parents; and said law is contrary to the Constitution of the United States and to the Constitution and statutory laws of the state of Mississippi;

(4) That the petition is insufficient in that it fails to state other specific crimes charged, the date of commission and conviction thereof, as intended by chapter 111, Laws 1916, as amended, including especially chapter 195, Laws 1922;

(5) That chapter 116, Laws 1916, was repealed by chapter 195, Laws 1922, and chapter 195, Laws 1922, fails to state any method of procedure to commit any child to the Mississippi Industrial Training School;

(6) That said chapter 111, Laws 1916, and amendments thereunder are illegal and unconstitutional, because said laws pertaining to the Mississippi Industrial Training School are not sufficiently described in the caption or title thereof, as provided by section 61 of the Constitution of the state of Mississippi;

(7) That they are unconstitutional, in that they attempt to regulate or restrict or control the religious belief of the child in strict violation of the provisions of article 1 of the Amendments to the Constitution of the United States;

(8) That the statute is unconstitutional, in that it attempts to deprive a person of his liberty without due process of law, without the right of trial by a jury of his peers.

This demurrer was overruled, and evidence was taken substantiating the bill of particulars, and judgment was rendered committing the said Howard Bryant to the said institution.

By chapter 132, Hemingway's Code, 1927, being sections 5697 to 5721 of said code, and embracing chapter 111 of the laws of 1916 and amendments thereto, is created the Mississippi Industrial Training School, for the care and training of children who are found to be destitute, abandoned, or delinquent, with the power to receive and hold property, real and personal, and have the same rights and privileges conferred by law on other eleemosynary institutions of this state. Said institution is under the management of a board of trustees, appointed by the Governor with the advice and consent of the Senate, which has the power to adopt all needful rules and regulations for the government of the institution, and select the superintendent (who shall be a man), all officers and employees, and fix their salaries. The superintendent is required to report to the board of trustees.

It is provided in said statutes that—"Any child less than eighteen years of age, and not less than seven years of age, residing or being at the time in the state of Mississippi, may be admitted to said institution, in the future, on the following conditions, and no other;

"(a) Where such child has violated any municipal ordinance or state law, when the violation thereof involved moral turpitude.

"(b) When a circuit judge or a chancellor shall certify in writing that such child is either immoral, delinquent, or incorrigible, in the opinion of such circuit judge or chancellor, and shall file said written certificate with the superintendent of said institution as a prerequisite of admission." Hemingway's Code 1927, section 5702.

It is further provided that—"All proceedings under this act shall be by written petition to the chancery or circuit judge, each of whom is hereby given jurisdiction over any such case which shall be brought before him from any county in his district, with power to act in vacation as well as at a term of court. Cases of delinquent children shall be given preference in point of time of hearing over all others, except writs of *habeas corpus.*" Section 5703.

It is also provided that—"Any reputable person having knowledge of a child in his county who appears to be a delinquent or destitute or abandoned child may file with the clerk of the circuit or chancery court of the county where the child shall be at the time, a petition in writing, setting forth the facts which constitute such delinquency, destitution, or abandonment, and the names and addresses of its parents or guardian if known, and if not known, stating such fact. Said petition shall be verified by the affidavit of the petitioner, which may be upon information and belief.

"Upon the filing of such petition, if it shall appear that either parent or guardian of said child resides in this state, the clerk shall issue a summons to such parent or

guardian directing him to appear and produce such child at the hearing of said petition, at the time and place appointed and show cause, if any, why such child should not be adjudged to be a delinquent or neglected child within the meaning of this act, and such summons shall be served not less than five days before the date set for the hearing, unless service be waived.

"In case it should appear that neither parent nor guardian of such child reside in this state, the clerk shall, not less than five days before the date for the hearing of the petition, mail a written notice to either parent or guardian, whose post office address can be ascertained, advising him of the time and place of hearing, and shall note such facts upon his docket." Section 5704.

Section 10 of the act, section 5706, Hemingway's 1927 Code, provides that—"If upon hearing of said petition, the judge shall adjudge such child to be delinquent, destitute, or abandoned within the meaning of this act, the court may send such child to the Mississippi Industrial and Training School, for an indefinite period of time, or to any other institution willing to receive him, which is or may be subject to inspection and approval by the court or by any person appointed by the judge, or the court may release such child on parol or probation, imposing such conditions upon both child and parents or guardian as may be deemed advisable, or the judge may give such child into the care and custody of its parents or guardian, or any other reputable person, subject to supervision by the court or by any person appointed by the judge; provided, that the judge may at any time make such changes in the care, custody, or supervision of such child as the welfare of the child may demand."

"Section 11 of the act, section 5707, Hemingway's Code, provides that—"In all cases where a child is found to be delinquent, destitute or abandoned, as defined in this act, the parent or parents, or guardian or person having the custody of such child, or any other person responsi-

ble for or by any act encouraging, causing, or contributing to the delinquency, destitution, or abandonment of such child may be required by the court to do or omit to do any act or acts which the judge may deem reasonable and necessary for the welfare of such child. Failure to comply with such requirements may be considered a contempt of court and punished as such. Nothing contained in this section shall prevent proceedings against such parent or guardian, under any statute of this state, or any municipal ordinance defining any act as a crime or misdemeanor.''

It is provided by section 12 of this act, section 5708, Hemingway's 1927 Code, that—''Whenever any child less than eighteen years of age is brought before any court charged with a misdemeanor, or the violation of a municipal ordinance, or state law, such court may, by an order entered on its minutes, transfer the case to the chancery judge of the district, to be dealt with as a case of delinquency in accordance with the provisions of this act, and therefore all papers and other documents pertaining to the case shall be transmitted to the clerk of the court to which the case is transferred.''

In section 16 of the act it is provided that—''If any child under the age of eighteen years shall be convicted by any court in this state of a crime involving moral turpitude, the trial judge, if he deems it for the best interest of such child, and the public welfare, may in his discretion remand such child to the Mississippi Industrial and Training School for a definite period, in lieu of other punishment, provided in such cases.'' Hemingway's Code 1927, section 5712.

And by section 17 of the act, section 5713, Hemingway's 1927 Code, it is provided that—''The superintendent of the Mississippi Industrial and Training School shall have power to discipline all children committed to said institution, and if any child sent to said institution in lieu of other punishment, after a conviction of a crime

or misdemeanor, shall prove incorrigible, or his presence or influence detrimental to the welfare of other children in the Mississippi Industrial and Training School, the superintendent may notify its committing judge of such facts, and said judge shall then proceed (in term-time or in vacation) to impose such sentence as he may deem proper within the limits of the law.''

It is provided by section 18 of the act, section 5714, Hemingway's 1927 Code, that—''Any child sent to the Mississippi Industrial and Training School by petition, under the provisions of this act, may be discharged by the superintendent, with the approval of the judge having custody of the child, whenever he shall deem it to such child's best interest, or to the best interests of the institution, or may be paroled by the superintendent under such conditions and restrictions as he may prescribe.

''Any child sent to the Mississippi Industrial and Training School after conviction of a crime or misdemeanor in lieu of other punishment may, upon the recommendation of the superintendent of the institution, be discharged by the order of the committing court or paroled by the court under such conditions and restrictions as he may prescribe. No child shall be kept in the Mississippi Industrial and Training School after reaching the age of twenty-one years, at which time he shall be entitled to a discharge, unless he shall have been convicted of a felony, in which event the circuit judge may by written order discharge him or impose whatever punishment he may deem proper within the limitations prescribed by law.''

Other sections of the act provide for the appointment of probation officers, and define their duties, among which is to make investigations, etc.

By section 20 of the act, section 5716, Hemingway's 1927 Code, it is provided that—''The provisions of this act shall be liberally construed and wide discretion given

all officers in carrying out its objects, with proper regard to the welfare of the child and to the public interest.''

By section 21 of the act, section 5717, Hemingway's 1927 Code, it is provided that—''Nothing herein contained shall be construed as abridging the power and jurisdiction of the chancery courts of the state of Mississippi, exercised over the persons and estates of minors, nor as an abridgment of the power and authority of said chancery courts or the chancellor in vacation or clerk in vacation to appoint guardians for minors, as now provided by law.''

It will be seen from an examination of the above-cited sections that there are two schemes provided in the law for dealing with immoral, delinquent, or incorrigible children, or those who violate the law, either state or municipal, where such law involves moral turpitude, and instead of inflicting the punishment ordinarily inflicted for a violation of these statutes in proceeding under this statute, if the court proceeds to try the child in the circuit court under indictment for either misdemeanor or felony, the child has all the rights accorded to any other person violating the law, including jury trial and other incidents of criminal law. But if the court having jurisdiction of the misdemeanor or felony is of the opinion that the chancery court can better deal with the child, having regard to all the circumstances of the case, than the circuit court, the case may be transferred to the chancery court for proceedings under section 10 of the act. If the cause is so transferred to the chancery court for hearing, it proceeds according to the procedure of the chancery court, and does not involve a prosecution for crime as such. In a case so transferred, the proceeding is changed from a criminal to a civil proceeding, and is governed by the rules of procedure in other civil cases. But in either event, the court may inquire into the fact, and establish the fact by proof that the child has, in fact,

violated the law of the state or of the municipality involving moral turpitude. The proceeding in the chancery court is not for the purpose of inflicting punishment or entertaining criminal jurisdiction. It is the remedial proceeding designed to reform and educate the child into habits of industry, good morals, and conduct.

Under section 5702 (b), the proceeding may be, in the first instance, before a judge or chancellor, and is not for the purpose of trying the delinquent, immoral, or incorrigible child for a specific crime, but evidence of the commission of a specific crime is received and may be considered for the purpose of determining whether the child is in fact immoral, delinquent, or incorrigible, and the proceedings under this statute are civil and not criminal. It has no reference to enforcing the criminal law as such, but deals with the character of the child, and the environment in which it moves and lives, as the subject-matter of inquiry, and is established as any other fact in a civil suit.

The Industrial Training School is not a punitive institution. It is in no sense a prison, but is an educational industrial institution, designed for the training of immoral, delinquent, incorrigible or abandoned children— to cause them to become moral and industrious. Its purpose is a beneficent one, often transforming a vicious and criminally inclined child into a moral, industrious, and useful citizen.

The statute provides due process of law, and the proceeding is in a court conducted in accordance with law and having legal objects for its end.

Primarily the parents, or those standing *in loco parentis* to minor children, have the constitutional right, under the Fourteenth Amendment, to the custody and control of such minor children, and may give them such education and training as in their judgment may seem best for the welfare of the child and for the good of society. *Meyer* v. *State of Nebraska,* 267 U. S. 390, 43 S.

Ct. 628, 67 L. Ed. 1042, 29 A. L. R. 1446; *Bartels* v. *Iowa,* 262 U. S. 404, 43 S. Ct. 628, 67 L. Ed. 1047; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468-477. In the second syllabus of the Meyer case as reported in 67 L. Ed. 1042, the rule is stated as follows:

"The liberty protected by the Fourteenth Amendment to the Federal Constitution may not be interfered with, under the guise of protecting the public interests, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect."

In the third syllabus in the same report it is said: "Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive, but is subject to supervision by the courts."

And in the fourth syllabus: "It is the natural duty of a parent to give his children education suitable to their station in life."

At page 1045 of the Lawyers' Edition (267 U. S. 400, 43 S. Ct. 627) the court said: "Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto. The calling always has been regarded as useful and honorable—essential, indeed, to the public welfare."

As long as parents properly exercise their duty, under their natural rights, to rear, educate, and control their children, their right to do so may not be interfered with solely because some other person or some other institution might be deemed better suited for that purpose. The children of the poor cannot be taken from them, and awarded to the rich or to some rich and powerful institution, merely because such person or such institution might, in the judgment of the court, do a better part by the child than the natural parents. But where the parents fail to perform their natural duty to so rear and educate the child as to make it a useful, intelligent, and

moral being, but permit it to go unrestrained and to become vicious in its habits and practices, and a menace to the rest of society, the state, as *parens patriæ* of all children, may assert its power and apply the curative, so as to prevent injury to the child and to society by the negligent and wrongful conduct of the parents in failing to exercise the proper control and restraint over the child in its tendencies.

In 31 C. J., at page 989, it is said: "A juvenile court is a court having special jurisdiction, of a paternal nature, over delinquent and neglected children. It is not a criminal court; its practice and procedure not being governed by the rules applicable to proceedings strictly criminal, but rather by those applicable in civil cases. It is a special court, a statutory tribunal; that is, it is created by statute, evidencing the tendency of modern legislation to exercise the function of the state, as *parens patriæ,* to protect infants in want of paternal care. Within constitutional limitations the legislature has power to create or establish such courts, and to confer upon them jurisdiction, powers, and duties which do not conflict with organic provisions; and generally, in states where such courts exist, they have jurisdiction over matters relating to the control and custody of infants. In some jurisdictions, the juvenile court is not an independent tribunal, but is a part of other established courts, and within constitutional limitations the legislature has power to designate other courts already established, or parts thereof, to sit as juvenile courts."

This statement in Corpus Juris is simply supported by authorities cited in the notes, some of which will be hereafter referred to.

In 14 R. C. L., p. 277, under the heading "Juvenile Courts," the following statement is made:

"A recent product of the solicitude of the law for the welfare of infants is the creation by statute of 'juvenile' or 'children's courts' to deal with dependent, neglected,

and delinquent children. By the term 'delinquent children,' as used in these statutes, is meant children who have committed offenses against the law, or who are found to be falling into bad habits, or to be incorrigible. The essential feature of these statutes is the creation of a special court, the procedure of which is less formal and more paternal than that of the regular criminal courts, and in which the child is protected from publicity and from association with adult criminals. The court is given a wide discretion in dealing with the child before it, and may order commitment to the care of probation officers or to public or charitable institutions, or in case of incorrigibility or actual criminal acts to a reform school or reformatory, instead of to the jail or penitentiary. Children below a certain age, which sometimes differs as between the sexes, are included in the scope of these acts. The courts have treated these statutes as beneficial and entitled to favorable construction. The objection that the informal procedure of the children's court does not constitute due process of law, and hence that the parental rights of the child's custody, or the child's own liberty, cannot be taken away legally by its order of commitment, has uniformly been overruled."

In 14 R. C. L., p. 277, section 45, it is said: "The power of the state goes further than to decide between contestants for the custody of children. If the parents are dead, or are found to be unfit or unable to retain the care of a child, and no suitable home with relations or friends is open to it, the state may directly assume its custody, and commit it to the control of the appropriate public officers, or to a public institution established or recognized by the state. Statutes enacted in the exercise of this power are not criminal in their nature, and the commital to a public home or charitable institution is not an imprisonment, but an intervention for the protection and help of the child, and the contentions that it deprives of life and liberty without due process of law, or imposes

a *status* of slavery, have often been denied. Nor is a jury trial essential to the validity of such a commitment. This is true, though the institution is a 'reform school,' and the commitment is because of waywardness or criminal conduct."

By section 159 of the state Constitution, the chancery court is given full jurisdiction of minors' business, cases of idiocy, lunacy, and persons of unsound mind, and all matters of equity, and the court of chancery has generally been openly recognized as the forum administering the power of the state known as *parens patriæ* power. A child under twenty-one years of age has never been regarded as entitled to unrestrained liberty of action. Restraint has always been deemed necessary for the welfare of the child itself, and it has not the liberty of action that adults have always been regarded as being entitled to. Restraint over a child is exercised ordinarily by the parent, and at certain ages it is absolutely necessary to prevent the child from becoming criminal and delinquent.

The questions which are raised in this case have been considered by many other courts, and a study of the decisions thereof will convince every thinking person, we think, that it is necessary, in some instances, for the state to exercise a supervisory power over the child and its parents for the protection of the child and society. In *Lindsay* v. *Lindsay*, 257 Ill. 328, 100 N. E. 892, 45 L. R. A. (N. S.) 908, Ann. Cas. 1914A, 1222, the supreme court of Illinois dealt at length with the questions which we are called upon to consider here. It was there held that—"Conferring upon an existing court jurisdiction over juvenile delinquents, and designating it as a juvenile court while exercising such jurisdiction, does not create a new court unauthorized by the Constitution" of Illinois.

In other words, it was held competent for the legislature to confer upon existing courts jurisdiction of minors

involved in the statute creating the Industrial Training School in this state. It was further held that "subjecting a delinquent child to proper restraint and guardianship does not unconstitutionally deprive him of his liberty," and that such a proceeding under such acts is not a proceeding according to the course of the common law, in which by the Constitution a jury of twelve men must be provided.

There is appended to the L. R. A. report of this case an extensive note dealing with the various objections to such a statute as we have before us. Many authorities are cited in this case note, showing that the courts generally have upheld statutes and proceedings such as are involved in this case. At page 916 of the L. R. A. report (257 Ill. 335, 100 N. E. 895) the court quoted with approval from another case the following:

"The right to liberty, which is guaranteed, is not that of entire unrestrainedness of action. Civil government in itself implied an abridgment of natural liberty. 'Civil liberty, which is that of a member of society, is no other than natural liberty, so far restrained by human laws (and no farther) as is necessary and expedient for the general welfare.' "

The court further said: "It is not natural, but civil liberty of which a person may not be deprived without due process of law. There are restrictions imposed upon personal liberty which spring from the helpless or dependent condition of individuals in the various relations of life, among them being those of parent and child, guardian and ward, teacher and scholar. There are well-recognized powers of control in each of these relations over the actions of the child, ward, or scholar, which may be exercised. These are legal and just restraints upon personal liberty, which the welfare of society demands, and which, where there is no abuse, entirely consist with the constitutional guaranty of liberty. See Cooley, Const. Lim. 339, 342."

The court, also, in the same opinion (257 Ill. 336, 100 N. E. 895, 45 L. R. A. [N. S.] at page 916), quoted from the case of *McLean County* v. *Humphreys,* 104 Ill. 378, as follows:

" 'It would be difficult to conceive of a class of persons that more imperatively demands the interposition of the state in their behalf than those we have just enumerated, and for whose benefit the act under consideration was adopted; and it would be a sad commentary on our state government, if it is true, as is contended, there is no constitutional power in the legislature to provide, by suitable legislation, for their education, control, and protection. It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriæ,* to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise. We perceive no force in the objection that the act in question is an infringement upon the personal liberty of the citizen, as guaranteed by the Constitution. The restraints which the act imposes are only such as are essential to the comfort and well-being of the unfortunate class of persons who are brought within its provisions. All governmental and parental care necessarily imposes more or less wholesome restraint; and we see nothing in the act which looks beyond this. Assuming, then, as we do, the legislature has the right to provide for the education, support and control of these unfortunate beings, it clearly has the right also to provide the necessary instrumentalities or agencies for the accomplishment of these objects.' "

In the case of *In re John Sharp*, 15 Idaho, 120, 96 P. 563, 18 L. R. A. (N. S.) 886, the supreme court of Idaho had before it an "act to provide for the care of delinquent children" (Laws 1905, p. 106), and that court held that such act "is not a penal or criminal statute in its nature, but is rather paternal, benevolent, and charitable in its purposes and operation, and is intended to confer and grant favors, privileges, and opportunities rather than to impose penalties, burdens, or exactions." It was further held that—"A minor child is not entitled, either by nature or the laws of the land, to his absolute and unqualified freedom and liberty in the same sense as those terms are applied to adults, but is rather, during his minority, subject to the restraint and custody of either his parents and natural guardians, or of a legally appointed guardian to whom he owes obedience and subjection, and it is not an infringement of any constitutional right of a minor for the state to summarily lay hold on him at such time as he may be deprived or bereft of his parents or duly appointed guardian, and give to him the fostering care, protection, and education that would be due him from his parent or guardian;" that "for the state to thus take charge, care, and custody of a minor, for the purposes of protecting, educating, and training him, is not depriving him of his liberty without due process of law within the purview and meaning of section 13 of article 1 of the Constitution."

In a case note to the L. R. A. report of this case are collected many cases dealing with various phases of the constitutional questions, and a study of these cases discloses that the courts have almost uniformly held that it is within the power of the state, in proper cases regulated by proper legal safeguards, to take from neglectful and vicious parents the custody of their children, when such children have become criminal in their tendencies and are likely to become criminals if allowed to go unrestrained. In the case note the author says:

"The question as to the extent to which a child's constitutional rights are impaired by a restraint upon its freedom seems invariably to have arisen with reference to statutes authorizing the commitment of dependent, incorrigible, or delinquent children to the custody of some institution. The decisions appear to warrant the statement as a general rule that, where the investigation is into the status and needs of the child, and the institution to which he or she is committed is not of a penal character, such investigation is one to which the constitutional guaranty of a right to trial by jury extends, nor does the restraint put upon the child amount to a deprivation of liberty within the meaning of the Declaration of Rights. But, where the child's offenses are considered for the purpose of administering punishment, so that such proceeding is in the nature of a prosecution, conviction, and punishment for crime, the child is entitled to the protection of all the safeguards of the Constitution."

In *Mill* v. *Brown*, 31 Utah, 473, 88 P. 609, 120 Am. St. Rep. 935, the court of Utah was called upon to deal with similar statutes creating juvenile courts. In the tenth syllabus of this case, as shown by the American State Reports, it was held that—"The statutes creating courts having jurisdiction of juvenile offenders are in no sense criminal, and are not intended to provide punishment, but to save the child from becoming a criminal, and are hence not unconstitutional, though they do not provide for trial by jury, or arraignment, or plea, nor notice to the person or a warrant of arrest, and require the child to be a witness against himself."

The opinion by the court is an elaborate one, and the questions are fully discussed and numerous authorities cited. In the case note appended to the American State Reports it is said:

"In many of the states of the American Union statutes exist which authorize the commitment of infants to reformatories under certain circumstances, and their de-

tention there, upon an informal hearing and without a trial by jury. The constitutionality of such statutes has often been assailed on the ground that the infant was thus deprived of his liberty without due process of law and without a trial according to the course of the common law, but the almost universal trend of judicial authority is that such statutes are constitutional and valid, that the offending child is not entitled, previous to his commitment, to a trial by jury as the reformatory to which he is committed is not a prison, but a school where reformation and not punishment is the end sought to be obtained''—citing many authorities.

There are many other authorities that could be quoted supporting the announcements made. We think the doctrines quoted from these cases are sound as applied to the case before us. The restraint imposed upon the minor in a training school must be a reasonable restraint, having reference and relation to the needs of the child, the customs, practices, and habits of the country. The rules and regulations prescribed by the trustees and enforced by the superintendent, and the punishment inflicted for violating them, must be reasonable, and the courts are open to the child or its parents at all times for an abuse by those having custody of the child of the authority vested in them by law or for exceeding the authority which the law confers upon them.

The provisions of the Constitution, with reference to involuntary servitude, do not have reference to legitimate authority for the control and education of children. Children have, throughout the history of the country and during all the ages of the law, been regarded as subjects of training and discipline within reasonable bounds. Under some of our statutes children, under certain conditions, can be apprenticed out, by the board of supervisors, for a term of years to prevent their becoming a public charge, and to learn them useful trades and occupations. It was never intended to interfere with this cus-

tomary power, in the enactment of the Thirteenth Amendment and the similar provisions in the state Constitution prohibiting involuntary servitude, except as a punishment for crime. The child could be apprenticed at common law, and all the constitutional provisions are to be interpreted in the light of the common law and the legal history of the country.

We think the proceedings before us conform to due process of law, and the statute is specific enough to inform the child and its parents of the facts which constitute delinquency, and the proceeding before us is on hearing and notice. We held in *Holden* v. *Smith*, 135 Miss. 322, 100 So. 27, that a child could not be committed without notice and hearing, and that the conditions named in the statute must have been shown to exist at a hearing in which the child and its parents had a right to be heard before the judgment of committal was made final.

We find from the proof in the present case that the child here involved was violating the laws of the land, and committed crimes involving moral turpitude; and, although the acts were not committed immediately preceding the hearing in the present case, they were committed before a former committal, which had been adjudged illegal, but during which the delinquent child had been actually confined in the Industrial Training School, and consequently had no opportunity to continue, during that period, his criminal career.

*Affirmed.*

ANDERSON, J. (dissenting). In addition to the statement of the case as contained in the majority opinion, the following appears in the record:

Ira Bryant and Lizzie Bryant, the father and mother of Howard Bryant, were made parties to this proceeding. In the petition of Mrs. Brown, the probation officer, to have Howard Bryant committed to the Mississippi Indus-

trial Training School, the grounds for such commitment are set out as follows:

"Petitioner shows further unto your honor that the defendants are adults and have the custody of the defendant Howard Bryant, who is a minor, under the age of eighteen years, and that the said adult defendants occupy the relationship of parents to the minor defendant, and that the said minor defendant is now living with or is under the control of the said adult defendants, and the petitioner shows that the said minor defendant is destitute within the meaning of chapter 111, Laws of Mississippi 1916, for the reason that the general environment of said child is such that said child is likely to develop into criminal practices unless removed from its present surroundings, and petitioner therefore shows that the said minor should be adjudged delinquent within the meaning of chapter 111, Laws of Mississippi 1916, and amendments thereto and be committed to the Mississippi Industrial Training School; that said minor has committed felony charges involving moral turpitude and many misdemeanors including violations of city ordinances."

On motion of the parents, the probation officer was required to present a bill of particulars of the grounds for such commitment. The following grounds were set out in the bill of particulars:

"That on November 27, 1925, Howard Bryant was convicted in the city court upon a charge of petit larceny, same being case No. 2183.

"That on November 8, 1926, the said Howard Bryant was again convicted for petit larceny, as shown by said docket, the same being 8529 upon the City Docket.

"That again on July 19, 1926, the said Howard Bryant was convicted upon a charge of being a dangerous and suspicious person, in the municipal court of the city of Hattiesburg, the same being case No. 8960.

"That again in the year 1926, on November 2d, the said Howard Bryant was convicted of petit larceny of certain personal property belonging to Charles De Fatta, the same being case No. 10122.

"That again in the year 1926 the said Howard Bryant was convicted of being a dangerous and suspicious person, in the municipal court of the city of Hattiesburg; which said conviction is shown on docket No. 10152.

"That in September, 1926, the said Howard Bryant in company with other boys burglariously and feloniously broke into the storehouse of the Polk Hardware Company, a partnership, and from said storehouse took, stole, and carried away of the goods and chattels of said partnership of more than twenty-five dollars in money, and that an affidavit charging said facts was duly and legally made in the justice of the peace court, and from said court was transferred to the chancery court, which transfer merged into and was the beginning of the proceedings before this court. And now, having stated all violations of law committed by the said Howard Bryant and all of which complainant has any knowledge, complainant prays that the same be considered indeed a full and complete answer to said motion."

The parents made answer to the petition of the probation officer. The answer, leaving off the formal parts, follows:

"Defendants deny that Howard Bryant, their minor child, has been convicted of any violation of the law of the state of Mississippi, or of any municipal ordinance involving moral turpitude.

"Defendants deny that the said Howard Bryant has at any time been legally convicted of any offense known to the laws of the state of Mississippi or of any city ordinance.

"Defendants deny that the said Howard Bryant has at any time or is now being subjected or permitted to live in any surroundings wherein said surroundings would

tend to make said Howard Bryant a criminal or criminally inclined.

"Defendants allege and charge and deny that it is true that Howard Bryant is an immoral, delinquent, or incorrigible child within the meaning of the statute, or in any sense of the word, or in any manner whatsoever, but defendants allege the facts to be that Ira Bryant and Lizzie Bryant, the father and mother of the said child, are well able to care for said child, and are caring for said child at the present time, and have been supporting and maintaining and educating said child under the proper environments and influences.

"Defendants deny each and every ground set out in the petition of the complainant, wherein it is alleged, or it is undertaken to be alleged, that the said Howard Bryant has been guilty of any crime or conduct involving moral turpitude, or being in any surroundings that would make him, or tend to make him, the said Howard Bryant, a fit subject to be committed to the Mississippi Industrial Training School at Columbia, Mississippi."

The evidence introduced to sustain the allegations of the petition of the probation officer tended to show that Howard Bryant had been convicted of crimes in the city court of Hattiesburg as follows: On November 27, 1925, of petit larceny; on July 19, 1926, of "being a dangerous and suspicious person;" on November 2, 1926, of petit larceny; on November 8, 1926, of petit larceny and, in addition, that in September, 1926, he, in company with some other boys, burglarized the store of Polk Hardware Company, in the city of Hattiesburg, and stole therefrom property of the value of more than twenty-five dollars, and that Howard Bryant was charged with this crime (which, under our statute, is a felony, and therefore a penitentiary offense) before a justice of the peace of the county, who, proceeding under the statute here involved, transferred the charge to the chancery court, which rendered the decree appealed from in this cause,

There was no testimony, either introduced or offered by the probation officer, to show that the parents of Howard Bryant were unfit to have his care, custody, and training. The statement, therefore, in their answer to the petition of the probation officer, that they were suitable persons to have his custody and training, went unchallenged.

The supreme court of Illinois, in *People ex rel. O'Connell* v. *Turner*, 55 Ill. 280, 8 Am. Rep. 645, in passing upon the constitutionality of a statute of that state similar to the one here involved, expressed my views so clearly and forcibly that I copy the opinion in that case, in part:

"What is proper parental care? The best and kindest parents would differ, in the attempt to solve the question. No two scarcely agree; and when we consider the watchful supervision, which is so unremitting over the domestic affairs of others, the conclusion is forced upon us, that there is not a child in the land who could not be proved, by two or more witnesses, to be in this sad condition. Ignorance, idleness, vice, are relative terms. Ignorance is always preferable to error, but, at most, is only venial. It may be general, or it may be limited. Though it is sometimes said that 'idleness is the parent of vice,' yet the former may exist without the latter. It is strictly an abstinence from labor or employment. If the child perform all its duties to parents and to society, the state has no right to compel it to labor. Vice is a very comprehensive term. Acts, wholly innocent in the estimation of many good men, would, according to the code of ethics of others, show fearful depravity. What is the standard to be? What extent of enlightenment, what amount of industry, what degree of virtue, will save from the threatened imprisonment? In our solicitude to form youth for the duties of civil life, we should not forget the rights which inhere both in parents and children. The principle of the absorption of the child in, and its com-

plete subjection to the despotism of, the state, is wholly inadmissible in the modern civilized world.

"The parent has the right to the care, custody, and assista e of his child. The duty to maintain and protect it is a p inciple of natural law. He may even justify an assault and battery, in the defense of his children, and uphold them in their lawsuits. Thus the law recognizes the power of parental affection, and excuses acts which, in the absence of such a relation, would be punished. Another branch of parental duty, strongly inculcated by writers on natural law, is the education of children. To aid in the performance of these duties, and enforce obedience, parents have authority over them. The municipal law should not disturb this relation, except for the strongest reasons. The ease with which it may be disrupted under the laws in question, the slight evidence required, and the informal mode of procedure, make them conflict with the natural right of the parent. *Before any abridgment of the right, gross misconduct or almost total unfitness on the part of the parent should be clearly proved. This power is an emanation from God, and every attempt to infringe upon it, except from dire necessity, should be resisted in all well-governed states.* 'In this country, the hope of the child, in respect to its education and future advancement, is mainly dependent upon the father; for this he struggles and toils through life, the desire of its accomplishment operating as one of the most powerful incentives to industry and thrift. The violent abruption of this relation would not only tend to wither these motives to action, but necessarily, in time, alienate the father's natural affections.'

"But even the power of the parent must be exercised with moderation. He may use correction and restraint, but in a reasonable manner. He has the right to enforce only such discipline as may be necessary to the discharge of his sacred trust; only moderate correction and temporary confinement. We are not governed by the Twelve

Tables, which formed the Roman law. The fourth table gave fathers the power of life and death, and of sale, over their children. In this age and country, such provisions would be atrocious. If a father confined or imprisoned his child for one year, the majesty of the law would frown upon the unnatural act, and every tender mother and kind father would rise up in arms against such monstrous inhumanity. Can the state, as *parens patriæ,* exceed the power of the natural parent, except in punishing crime?

"These laws provide for the 'safe-keeping' of the child; they direct his 'commitment,' and only a 'ticket of leave,' or the uncontrolled discretion of a board of guardians, will permit the imprisoned boy to breathe the pure air of heaven outside his prison walls, and to feel the instincts of manhood by contact with the busy world. The *mittimus* terms him 'a proper subject for commitment,' directs the superintendent to 'take his body,' and the sheriff indorses upon it, 'Executed by delivering the body of the within-named prisoner.' The confinement may be from one to fifteen years, according to the age of the child. Executive clemency cannot open the prison doors, for no offense has been committed. The writ of *habeas corpus,* a writ for the security of liberty, can afford no relief, for the sovereign power of the state, as *parens patriæ,* has determined the imprisonment beyond recall. Such a restraint upon natural liberty is tyranny and oppression. If, without crime, without the conviction of any offense, the children of the state are to be thus confined for the 'good of society,' then society had better be reduced to its original elements, and free government acknowledged a failure.

"In cases of writs of *habeas corpus* to bring up infants, there are other rights beside the rights of the father. If improperly or illegally restrained, it is our duty, *ex debito justitiæ, to liberate.* The welfare and rights of the child are also to be considered. The disability of minors

does not make slaves or criminals of them. They are entitled to legal rights, and are under legal liabilities. An implied contract for necessaries is binding on them. The only act which they are under a legal incapacity to perform is the appointment of an attorney. All their other acts are merely voidable or confirmable. They are liable for torts, and punishable for crime. Lord KENYON said: 'If an infant commit an assault, or utter slander, God forbid that he should not be answerable for it, in a court of justice.' Every child over ten years of age may be found guilty of crime. For robbery, burglary, or arson, any minor may be sent to the penitentiary. Minors are bound to pay taxes for the support of the government, and constitute a part of the militia, and are compelled to endure the hardship and privation of a soldier's life, in defense of the Constitution and the laws; and yet it is assumed that to them liberty is a mere chimera. It is something of which they may have dreamed, but have never enjoyed the fruition.

"Can we hold children responsible for crime, liable for their torts, impose onerous burdens upon them, and yet deprive them of the enjoyment of liberty, without charge or conviction of crime? The Bill of Rights declares that 'all men are, by nature, free and independent, and have certain inherent and inalienable rights—among these are life, liberty, and the pursuit of happiness.' This language is not restrictive; it is broad and comprehensive, and declares a grand truth, that 'all men,' all people, everywhere, have the inherent and inalienable right to liberty. Shall we say to the children of the state, you shall not enjoy this right—a right independent of all human laws and regulations? It is declared in the Constitution, is higher than Constitution and law, and should be held forever sacred.

"Even criminals cannot be convicted and imprisoned without due process of law—without a regular trial, according to the course of the common law. Why should

minors be imprisoned for misfortune? Destitution of proper parental care, ignorance, idleness, and vice, are misfortunes, not crimes. In all criminal prosecutions against minors, for grave and heinous offenses, they have the right to demand the nature and cause of the accusation, and a speedy public trial by an impartial jury. All this must precede the final commitment to prison. Why should children, only guilty of misfortune, be deprived of liberty without 'due process of law?'

"It cannot be said that in this case there is no imprisonment. This boy is deprived of a father's care, bereft of home influences, has no freedom of action, is committed for an uncertain time, is branded as a prisoner, made subject to the will of others, and thus feels that he is a slave. Nothing could more contribute to paralyze the youthful energies, crush all noble aspirations, and unfit him for the duties of manhood. Other means of a milder character, other influences of a more kindly nature, other laws less in restraint of liberty, would better accomplish the reformation of the depraved, and infringe less upon inalienable rights."

The position of the supreme court of Illinois is sustained by the supreme court of New Hampshire, Kansas, and California, in *State ex rel. Cunningham* v. *Ray,* 63 N. H. 406, 56 Am. Rep. 529, *In re Sanders,* 53 Kan. 191, 36 P. 348, 23 L. R. A. 603, and *Ex parte Becknell,* 119 Cal. 496, 51 P. 692.

Section 15 of our Constitution provides that there shall be neither slavery nor involuntary servitude, except in punishment of crime for which the defendant has been duly convicted. Section 31 of the Constitution provides for trial by a jury in *all criminal prosecutions.* Section 27 of the Constitution prohibits prosecution for a felony, except upon a precedent indictment by a grand jury. Section 22 of the Constitution, among other things, provides that no person's life or liberty shall be twice placed in jeopardy.

It is true that the constitutionality of statutes of other states similar to ours has been upheld by the greater number of cases in those states; but in my judgment their reasoning is unsound, and therefore the weight of authority is the other way. It cannot be said truthfully that the Industrial Training School in this state is not a penal institute. It is as much a penal institution as the modern, well-regulated, humanely managed penitentiary. Its inmates are restrained of their liberty of action, notwithstanding the purpose of the law is to reform and educate them. That also is true in a large measure of all penal institutions, both state and Federal. Under the statute the child is arrested and tried, and pending the trial he is in the custody of the sheriff, and is entitled to bail. On conviction he is committed to the institution—he is in prison, where he may be kept until he is twenty-one years of age. And, while so imprisoned, the statute makes it a criminal offense for any one to aid him in escaping from the institution. Under the statute correction in the form of corporal punishment may be administered if necessary. A child proceeded against under the statute is charged with crime. It is not a civil proceeding, but a criminal proceeding.

In *Grenada Lumber Co.* v. *State*, 98 Miss. 536, 54 So. 8, in discussing the line of demarkation between a criminal cause and a civil case, our court said:

"The term 'civil cause,' in our judgment, was intended to comprehend every conceivable cause of action, whether legal or equitable, except such as are 'criminal' in the usual sense; that is, where the judgment against the defendant may be a fine or imprisonment, or both, and, in case of fine alone, imprisonment until payment."

Under the authority of the statute the child is charged with a crime or crimes, tried and convicted without the right of trial by jury, and, in case of a felony, without a precedent indictment by a grand jury. And, furthermore, under the statute the crime may be made up of

other crimes of which the child has already been convicted. Therefore, in my judgment, the statute, as sought to be enforced in this case, violates sections 15, 22, 27, and 31 of our Constitution. The main theory on which such statutes have been upheld is that the state has the right to act as parent for the child, in case his parents are unfit to have his care and custody. In other words, where the parents leave off in their duty to the child, the state is entitled to take up the burden and act in the place of the parent. Conceded, for argument's sake, that this is a sound principle—can the state, in the care and training of the child, go further than the parents have a right to go? It seems to me that to ask the question is to answer it. The state can only do those things for the child that the parents fail to do. Surely no one would take the position that the parents would have the right to imprison their child until he was twenty-one years of age for any offense whatsoever. That is exactly what the state may do under this statute.

I deny the constitutional right of the state to take a child from its parents to rear and educate, without their consent, unless it be shown that the parents are unfit for the undertaking. The statute involved authorizes exactly that to be done. As stated, there was no effort to show that Howard Bryant's father and mother were unfit to have his custody and training. The parents of a child are its guardians. They are so by the law of nature. God has so decreed, and that decree cannot be rightfully violated by the state, any more than it can be by man, unless the parents have failed to carry out their sacred trust. Here the state has torn this child away from the arms of its mother and father, without any pretense of showing that they are unfit to rear it, unless it can be said that the fact of the child's being convicted of various petty offenses, and having been charged with a felony, was sufficient to show the unfitness of the parents. I deny that this was sufficient. How many par-

ents, standing at the top morally and socially, who are doing their best to rear their children as they ought to be reared, nevertheless have one or more who are constantly committing the same character of crimes of which Howard Bryant was convicted. They are on every hand. Where is our state going to stop in its march of paternalism?

What has become of one of the fundamental principles of our government, that the people who are the least governed are the best governed. When the state undertakes to do too much for the people, the result is they do too little for themselves—they rely on the state. By the statute here involved the state enters the sacred precinct of the home, and says to the parents of the child, although you are doing the best you can to rear your child properly, you are making a failure of it, and the state is going to undertake the job. If the state can go that far, why not go a step further, and say by law that only those who are fit according to a moral, intellectual, and property standard fixed by the state, shall marry and bring children into the world?

The companionship and services of their children are a valuable property right given their parents both by the laws of nature and by the laws of the state. Like any other property right, it cannot be arbitrarily taken away from them by the state. To take such a property right away, the state must show the parents have done something to forfeit it. Otherwise they would be deprived of their right in violation of the due process provision of the federal and state Constitution.