FORBES *et al. v.* WARREN.

(In Banc. Feb. 13, 1939. Suggestion of Error Overruled March 20, 1939.)

[186 So. 325. No. 33398.]

Conner & Hammond, of Columbia, for appellants.

**T. B. Davis**, of Columbia, for appellee.

Argued orally by **Claude E. Conner**, for appellant, and by **T. B. Davis**, for appellee.

**Anderson, J.,** delivered the opinion of the Court.

This is a habeas corpus proceeding in the Chancery Court of Marion county, by the appellee, J. E. Warren, father of Mollie Jo Warren, a minor, against the appellants, Mr. and Mrs. A. S. Forbes, the maternal grandparents of the child, to recover her custody. The case was heard on bill, answer and proofs, resulting in a decree in favor of appellee. From that decree appellants prosecute this appeal.

The appellee married Mollie Forbes, daughter of the appellants, in June, 1923. Mollie Jo Warren, the only child of the marriage, was born March 22, 1924—the mother died a few hours thereafter. The father and grandparents agreed that the child should remain with the latter. She has been with them ever since.

For some years the father was engaged as a railroad worker in Louisiana, Arkansas and Texas; during that time he did not often see the child. He quit railroad work and married in 1934. There are no children by this marriage. He bought a small farm in Marion county. When this action was begun in July, 1937, he was engaged in operating his farm, and he and his wife were residing thereon. The grandparents are also country people, residing on a farm in a neighborhood some distance from the father and stepmother. Their farm consists of about two hundred acres, on which there are tenants. The child will be fifteen years old on her next birthday. All her life she has been with her grandparents. The contributions of her father for her maintenance and care have been small compared to that of her

grandparents—they have borne very much the larger part of the cost of her care, maintenance and education, although there was no evidence that the father had declined to contribute thereto when called upon.

The evidence showed without conflict that the grandparents were eminently fitted, morally, intellectually and financially, to have the care and custody of the child. The evidence also tended to show, and the Chancellor necessarily found as a fact, that the father and stepmother were fit persons to have her custody and control. The grandfather and grandmother are about fifty-nine and fifty-three years of age, respectively, while the father is in his forties, and the stepmother in her late thirties. Before her marriage the stepmother was a school teacher.

The grandparents were willing, with the consent of the child, to grant her custody to her father and stepmother —they left it to the child. It is conceded by the father and stepmother that the child was not willing to go to them. The evidence showed, without conflict, that she was passionately opposed to going. There was some evidence tending to show that the change might jeopardize the health of the child. The change would result in new surroundings, new acquaintances and companions. There is no substantial conflict in the evidence that the happiness, welfare and best interests of the child are with her grandparents, and not with her father and stepmother. The question is, whether those considerations should be controlling, under the facts of this particular case. We are of opinion that they should be. It is true that, everything else being equal, the father is entitled to the custody of his child. Nevertheless, ''The welfare of the child or children is the matter of chief importance; and the consideration of their welfare will prevail over any mere preponderance of legal right in one or the other party. . . . The age, sex and physical condition of the child are often important elements in determining what custody would be for its best welfare. . . . The wishes of children of sufficient capacity to choose for

themselves should be given especial consideration when their parents have, for a long time, voluntarily allowed them to live in the family of another, and the Court will make no coercive order in such cases to enforce the mere legal right of the parent to their custody against the manifest inclination and reasonable choice of the children to remain where they are.'' 20 R. C. L., Sec. 15, pages 601-603. These principles are supported by a wealth of authorities from other states, referred to in the notes. To the same effect are Cocke v. Hannum, 39 Miss. 423; Maples v. Maples, 49 Miss. 393; McShan v. McShan, 56 Miss. 413; Hayes v. Morgan (Miss.), 164 So. 880.

Bryant v. Brown, 151 Miss. 398, 118 So. 184, 60 A. L. R. 1325, illustrates how far the courts will go in considering the best interest of the child as against the parents. The child, in that case, had been guilty of some petty misdemeanors. The mother and father were not shown to be unfit to have its custody and rearing; but it was shown to the satisfaction of the court that its best interest was as an inmate of the State Industrial Training School. Accordingly it was committed to that institution. That action of the trial court was affirmed by this Court. What the Supreme Court of Florida said in Bourn v. Hinsey, 183 So. 614, 617, is helpful on this question. The Court used this language: ''But when the ties of blood run counter to the force of environment, the former usually give way or tragedy follows.''

What we are holding does not trench on Hibbette et al. v. Baines, 78 Miss. 695, 29 So. 80, 87, 51 L. R. A. 839. The Court held in that case that the separation of the children from each other was a matter to be considered along with the feeling between them and their father. With reference to the feeling, the Court used this language: ''What does the record show as to the state of feeling between the father and his children? The father came from Birmingham to see his children several times every year, except for one interval of two years; and was vis-

ited by his children at his home in Birmingham; and there was a regular correspondence kept up between him and the aunts and the grandmother, and letters were also regularly written or messages sent for the children to their father. These letters and messages on the part of the children breathe the tenderest affection. They call him 'Darling Pops,' and anticipated his visits with greatest pleasure. On his part his letters show the deepest and most constant affection and solicitude.'' No such feeling was shown to exist between appellee and his daughter.

Reversed and judgment here for appellants.

**Ethridge, J.**, delivered a dissenting opinion.

The evidence in the case amply warranted the findings; and the law, as applied to these findings, sustains the decree rendered, and the case should be affirmed.

In human relations there are often heartbreaking situations which unfortunately cannot be avoided. The law of necessity must deal with these human relations, and operate under general rules, so that citizens and courts may act in accordance with the law.

In the argument before Division B of this Court it was admitted that the appellee, Warren, and his wife were suitable persons to have charge of Mr. Warren's daughter; but the argument proceeded upon the ground that the affections of the grandparents had grown up around the child, that they had cared for her a long time, and that the courts should not disturb the relation thus established. As in most cases, the evidence is apparently conflicting upon many features of the case; but there is no evidence which would warrant the finding by this Court that J. E. Warren or his wife were of such character, or guilty of such conduct, as would forfeit his right to the custody of his child. On the evidence the court, in rendering an opinion, made a finding of fact which reads as follows:

"The court finds that Mollie Jo Warren, minor child of Mr. and Mrs. J. E. Warren, was born on the 22nd day of March, 1924. Mrs. J. E. Warren, the mother of said child, was the daughter of Mr. and Mrs. A. S. Forbes, respondents here. Mrs. J. E. Warren, mother of Mollie Jo Warren, died about three or four hours after the birth of Mollie Jo and the child was placed by her father in the home of Mr. and Mrs. A. S. Forbes, who have had her custody since. The court finds that the child at the time of the institution of this habeas corpus proceeding was over the age of thirteen years, and had attained the age of fourteen before judgment in this cause was entered.

"The court finds that the child expresses and has a sincere desire to remain in the custody of her maternal grandparents, Mr. and Mrs. A. S. Forbes, and if her wishes were considered alone she would select the home and custody of her maternal grandparents. The court finds that the father, J. E. Warren, married again on the 23rd day of February, 1934. The court finds from the evidence in this case that there is nothing against the character or suitability of either the maternal grandparents, Mr. and Mrs. A. S. Forbes, or the father, J. E. Warren, or his second wife, Mrs. J. E. Warren, that would render either of them unsuitable to have the care, custody and control of said child and that the physical and spiritual welfare could be safely entrusted to either the maternal grandparents or the father and his second wife, Mrs. J. E. Warren, and that the child has received the proper care and attention by the maternal grandparents during the time they have had her custody.

"Respondents forcibly argue and urge that the father, J. E. Warren, abandoned his child and that the best interest of the child, Mollie Jo Warren, would be best served by permitting her to remain with her maternal grandparents with whom she desires to live but the court finds from all the evidence in the case that the father, J. E. Warren, did not without just cause forsake or de-

sert his child as to show any intent to shirk or evade his duty to her or that he sought to evade the duty, trouble or expense of rearing it or had a reckless disregard for its welfare or that he was guilty of such abandonment of it as to bar his right to afterward reclaim its custody and for this reason the court cannot adhere to the wishes of the child to remain with her maternal grandparents and for this reason it is the duty of the court to award the custody of the child to the petitioner, J. E. Warren. A decree may be drawn accordingly.''

That this Court is bound by the findings of fact by the Chancellor on conflicting evidence is abundantly established by the authorities in this State; and numerous cases will be found in 2 Mississippi Digest, annotated, title Appeal and Error, Key No. 1001 to 1024, and need not be reviewed or set forth in this opinion.

The decision of the majority in this case has unsettled the law and made it uncertain, and is contrary to the decisions announced throughout the history of the State upon the subject, and especially since the case of Hibbette et al. v. Baines, 78 Miss. 695, 29 So. 80, 87; 51 L. R. A. 839, which case was tried at the October term, 1900, and since that time until now has been the settled law of the State. The Court in that opinion elaborately reviewed the authorities upon the subject throughout the country; and it was there held that on habeas corpus by a father for his children, in the custody of collateral relatives, it will be presumed to be for the best interests of the children to be with their father, unless his unfitness or abandonment of the children be shown. It was also held that where a mother on her deathbed, in the presence of and with the consent of her husband, gave the custody of her children to her mother for life, and after her death, of her boy to one aunt and of her girl to another aunt, such disposition of the children, as a contract, was against public policy and void.

We have also held that where children had, under such an arrangement, remained with their grandmother

for ten years, during which time their father contributed in a considerable degree to their needs and visited them several times a year, that it cannot be said, on his claiming custody of them at the death of their grandmother, that he had abandoned them in favor of their aunts, and they should be awarded to him where it appears they are more liable to be separated by remaining with the aunts, and that he is of good moral character and in good financial condition. And, further, that the action of a trial court in refusing, in habeas corpus proceedings, to assent to the preference expressed by the children, aged ten and thirteen years, to remain with their maternal aunts, rather than to go with their father, would not be disturbed on appeal.

The opinion in the case of Hibbette v. Baines, supra, is an exhaustive and well-reasoned one, and it will be noted in reading the opinion that there, as here, the father had no other children, and that his second wife was childless.

In the present case the wife is a lady of excellent character, having nine years of experience as a school teacher, dealing with children; and had lived in the home of her sister, and assisted in rearing the child of her sister—the evidence showing that the child knew practically no difference in its affection for its mother and its aunt, the wife of appellee here.

Not only have the decisions since 1900 conformed to the doctrine announced in the case of Hibbette v. Baines, supra, but the statutes of the state have, for a long time, recognized the right of the parents, as against all others, to the custody and control of their children, and the guardianship of their persons. The present statute, section 1863, Code of 1930, gives the parents equal rights to the custody and control of their children, but provides that on the death of either parent, the guardianship shall be awarded to the other; providing as the sole qualification that should the father or mother be unsuitable to discharge the duties of guardianship, then the court, or

chancellor in vacation, may appoint some suitable person, or having appointed the father or mother, may remove him or her if it should appear that such person is unsuitable, and appoint a suitable person. This statute is in harmony with the laws of natural rights, which rise superior to the arbitrary or regulatory rights of the State, or any of its agencies, to interfere with a parent's rights, where the latter is a good moral character, and has done nothing to forfeit those rights.

In Moore v. Christian, 56 Miss. 408, 31 Am. Rep. 375, decided in 1879, it was held that a widowed mother, though poor and dependent, was entitled to the custody of her thirteen-year-old son, notwithstanding he preferred remaining with a kind man, of good character and means, to whom his father had contracted him. In the opinion of the Court in that case, near the bottom of page 410, and on through page 411, and the top of page 412, in discussing the matter it was said:

"Nature gives to parents that right to the custody of their children which the law merely recognizes and enforces. It is scarcely less sacred than the right to life and liberty, and can never be denied save by showing the bad character of the parent, or some exceptional circumstances which render its enforcement inimical to the best interests of the child. Our statute law provides for appointing guardians of the estates of minors, whether their parents are living or dead; but expressly forbids the appointment of guardians of their persons if either parent be alive, thus recognizing in the broadest manner the parental right to their custody. Code 1871, section 1202. So, too, all officers and courts are forbidden to apprentice any minor without the consent of the parent, unless it be shown that the parent has failed or been unable to take charge of the child, or is of immoral habits. Code 1871, section 1793. No higher evidence could be afforded of the sanctity with which our law invests the parental right of custody, or rather recognizes and protects the right given by nature and by God. It is, in-

deed, held that this parental right must give way to the permanent interest of the child, if it be shown that the life, or health, or morals of the latter will be prejudiced, or his usefulness as a citizen seriously jeopardized, by remaining under the parental control; but it is not meant by this that the courts can sit in judgment upon the question whether a wealthy stranger can give to the child more worldly advantages than an indigent parent. This would be to make poverty a crime, and to punish it by the bitterest of penalties. In the case at bar, it is not shown, or attempted to be shown, that the mother is in any respect an improper person to control and govern her own offspring. Nothing is alleged against her except her poverty and her dependent condition, and that would seem to furnish a reason rather in favor of than against her right to demand and obtain the control and the services of that one of her children who can aid her in rearing and supporting the others.

"The boy, it is true, expresses a preference to remain with the appellee; but, while in doubtful cases the wishes of a child of this age will be sought, and to some extent be observed, we cannot for a moment agree that a boy of thirteen can be allowed, at pleasure, to abandon his filial duties, and select elsewhere a home more agreeable either to his desires or his worldly interests. So to hold would simply be to offer a premium to the children of the poor to shirk the duties to which their station in life has called them, and to permit them, at the sacrifice of all the natural affections, to set about bettering their condition, at a period of life when the law dedicates both their persons and their services to parental control."

In Bullard v. Welch, 171 Miss. 833, 158 So. 791, it was held that a mother's dying request that her child be placed in the custody of her married daughter, and the father's assent thereto, if viewed as a contract for the disposition of the child, was void as against public policy, as respects the father's right to recover the child's custody. In Stegall v. Stegall, 151 Miss. 875, 119 So. 802,

it was held that as against the mother the paternal grandparent had no right to the child, unless it was shown that the mother had forfeited her right by abandonment or immoral conduct. In Sinquefield v. Valentine, et al., 159 Miss. 144, 132 So. 81, 76 A. L. R. 238, it was held that the father is entitled to the custody of the child as against all persons except the mother, unless he forfeits that right by misconduct, showing him to be unsuitable.

In the case of Bryant v. Brown, 151 Miss. 398, 118 So. 184, 188, 60 A. L. R. 1325, we had occasion to elaborately review the conditions under which forfeiture of right to control and custody of a child by its parents might be taken advantage of by the State, or under state action. It was there held that the parent had the right to custody and control of the child, until such right was forfeited by misconduct. In the majority opinion, concurred in by five of the Judges then constituting the Court, we said:

"Primarily the parents, or those standing in loco parentis to minor children, have the constitutional right, under the Fourteenth Amendment, to the custody and control of such minor children, and may give them such education and training as in their judgment may seem best for the welfare of the child and for the good of society. Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 628, 67 L. Ed. 1042, 29 A. L. R. 1446; Bartels v. Iowa, 262 U. S. 404, 43 S. Ct. 628, 67 L. Ed. 1047; Pierce v. Society of Sisters, 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A L. R. 468-477. In the second syllabus of the Meyer Case as reported in 67 L. Ed. 1042, the rule is stated as follows: 'The liberty protected by the Fourteenth Amendment to the Federal Constitution may not be interfered with, under the guise of protecting the public interests, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.' In the third syllabus in the same report it is said: 'Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive, but is subject to super-

vision by the courts.' And in the fourth syllabus: 'It is the natural duty of a parent to give his children education suitable to their station in life.' At page 1045 of the Lawyers' Edition (267 U. S. 400, 43 S. Ct. 627), the court said: 'Practically, education of the young is only possible in schools conducted by specially qualified persons who devote themselves thereto. The calling has always been regarded as useful and honorable—essential, indeed, to the public welfare.' As long as parents properly exercise their duty, under their natural rights, to rear, educate, and control their children, their right to do so may not be interfered with solely because some other person or some other institution might be deemed better suited for that purpose. The children of the poor cannot be taken from them, and awarded to the rich or to some rich and powerful institution, merely because such person or such institution might, in the judgment of the court, do a better part by the child than the natural parents. But where the parents fail to perform their natural duty to so rear and educate the child as to make it a useful intelligent, and moral being, but permit to go unrestrained and to become vicious in its habits and practices, and a menace to the rest of society, the State, as parens patriæ of all children, may assert its power and apply the curative, so as to prevent injury to the child and to society by the negligent and wrongful conduct of the parents in failing to exercise the proper control and restraint over the child in its tendencies.''

This opinion reviewed the authorities upon the subject of the right of the parent as against the State or government, and the conditions under which the custody of the child might be taken from the parents. Judge Anderson dissented, on the ground that the statute authorizing taking charge of the delinquent child for purposes of discipline, education and control, was beyond the power of the Legislature; because, in his opinion, the proof did not warrant the proceedings there involved. In the course of his dissent he recognized the constitutional

right of a parent to the custody and control of a child until the parent had forfeited that right by misconduct. He said:

"The parent has the right to the care, custody, and assistance of his child. The duty to maintain and protect it is a principle of natural law. He may even justify an assault and battery, in the defense of his children, and uphold them in their lawsuits. Thus the law recognizes the power of parental affection, and excuses acts which, in the absence of such a relation, would be punished. Another branch of parental duty, strongly inculcated by writers on natural law, is the education of children. To aid in the performance of these duties, and enforce obedience, parents have authority over them. The municipal law should not disturb this relation, except for the strongest reasons. The ease with which it may be disrupted under the laws in question, the slight evidence required, and the informal mode of procedure, make them conflict with the natural right of the parent. Before any abridgment of the right, gross misconduct or almost total unfitness on the part of the parent should be clearly proved. This power is an emanation from God, and every attempt to infringe upon it, except from dire necessity, should be resisted in all well-governed States. 'In this country, the hope of the child, in respect to its education and future advancement, is mainly dependent upon the father; for this he struggles and toils through life, the desire of its accomplishment operating as one of the most powerful incentives to industry and thrift. The violent abruption of this relation would not only tend to wither these motives to action, but necessarily, in time, alienate the father's natural affections.' . . . The Bill of Rights declares that 'all men are, by nature, free and independent, and have certain inherent and inalienable rights—among these are life, liberty and the pursuit of happiness.' This language is not restrictive; it is broad and comprehensive, and declares a grand truth, that 'all men,' all people, everywhere, have the inherent and in-

alienable right to liberty. Shall we say to the children of the State, you shall not enjoy this right—a right independent of all human laws and regulations? It is declared in the Constitution, is higher than Constitution and law, and should be held forever sacred." And at page 1341 of 60 A. L. R., 118 So. at page 194, he further said: "I deny the constitutional right of the State to take a child from its parents to rear and educate, without their consent, unless it be shown that the parents are unfit for the undertaking. The statute involved authorizes exactly that to be done. As stated, there was no effort to show that Howard Bryant's father and mother were unfit to have his custody and training. The parents of a child are its guardians. They are so by the law of nature. God has so decreed, and that decree cannot be rightfully violated by the State, any more than it can be by man, unless the parents have failed to carry out their sacred trust."

Near the bottom of that page he says: "The companionship and services of their children are a valuable property right given their parents both by the laws of nature, and by the laws of the State. Like any other property right, it cannot be arbitrarily taken away from them by the State. To take such a property right away, the State must show the parents have done something to forfeit it. Otherwise they would be deprived of their right in violation of the due process provision of the federal and state Constitutions."

In Nickle v. Burnett, 122 Miss. 56, 84 So. 138, 140, we reaffirmed the doctrine of Hibbette v. Baines, supra, and quoted from Weir v. Marley, 99 Mo. 484, 494, 12 S. W. 798, 6 L. R. A. 672, as follows: "The horizon which bounds the child of 10 or 13 is not the horizon the whole perspective of which is necessary to take into view in determining who shall have the training and character building of children. The vision of the little ones of 10 and 13 sees nothing beyond the horizon bounding those years. They cannot balance the advantages and

disadvantages of different custodians, so as to correctly determine which one will guide it best, and fashion it most wisely into the make-up of perfect manhood and womanhood.'' We further said in this opinion: ''We think, as against all save the mother, the father has the supreme right to the control and custody of his child unless he has forfeited this right by immoral conduct, or by an abandonment of the child, and that the mere fact that the affections of other people have attached to and grown for the child, and that they may have had temporary custody of it, under circumstances not amounting to abandonment on the part of the parent, does not warrant the court in depriving the parent of his child or children.''

In numerous cases we have held that the father is under the duty to support his child, and this duty he must perform. There is no condition in the law, so far as I have found, by which a father can get rid of this duty to support and care for his child. He may forfeit his right to its custody and control if he is morally unfit, or if he wilfully and persistently neglects, to exercise such control, and permits it to grow up under circumstances tending to make a criminal of it. There is no more sacred right known to the law than that existing between parent and child.

As to the decisions of the United States Supreme Court cited in Bryant v. Brown, supra, the right of the parent to marry and rear a family is one of the liberties secured to the citizen against state action without due process of law. The home is the foundation of the State and of society. The welfare of the State and of society requires that the home be maintained, and that its sanctities be inviolate so long as the members of the home conduct themselves in a moral manner. Whenever the state takes charge of the children merely because some other person may think the child will fare better, or be better trained or developed in another home than that of its parents, then the State becomes a tyrant, and American

ideals perish. The child, it is true, has a right to be protected from vice and crime, but mere differences in financial or social advantages are wholly insufficient to justify interference by the State through its courts or otherwise.

Instead of taking the Constitution as a guide, and justice as a goal, the decision here, in its ultimate effect, adopts the grandparents' sentiments and the opinions of infancy as a guide and goal, leaving the law uncertain, and dependent upon the particular ideas of particular judges, who may pass upon particular cases, to be governed by their individual ideas, rather than by the law of the land.

The majority opinion cites Cocke v. Hannum, 39 Miss. 423, as authority for its position; but that case involved a contest between the father and mother of the child, who, under our law, have equal rights to the control and custody, and in such cases the welfare of the child is the guiding star, or "pole star" as it is expressed, pointing to the proper decision. In such case the child, if it has reached the age of sufficient maturity to possess good judgment, may be consulted as to its wishes and ideas as to what will be best for it. But there is no sound decision anywhere which would enable a child of thirteen or fourteen to leave its father's care, custody and control, merely because the child preferred to live elsewhere, and thought its welfare would be promoted by a change.

The majority opinion also cites and relies upon Maples v. Maples, 49 Miss. 393. In that case the mother was adjudged not to be entitled to the custody of her son, who was in the home of his grandfather, and who had left his mother when he was about fifteen years of age; but in that case it is shown that the mother had seven children by different fathers; that she was a servant, and lived in the kitchen of the father-in-law of her agent, who prosecuted the case in the Chancery Court; and that she was a resident of the State of Alabama; that she had no other home or employment—and neither her employ-

ment nor her character gave promise of proper care for her son. ''He is evidently wanted by her to be hired out to other parties''—so said the Court. The fact that the mother was a servant, living in the kitchen of her employer, and that she had seven children by different fathers, was certainly sufficient reason to warrant the belief that she was morally unfit to have the custody of her son; and the Court concluded, as stated, that she wanted him for no purpose except to hire him out for money.

In my opinion, these cases cannot be said to justify departure from numerous cases in which we have held as above stated.

The opinion of the majority also cited the case of McShan v. McShan, 56 Miss. 413, immediately following the case of Moore v. Christian, above referred to. The Court begins its opinion by stating: ''This is a contestation between the father and mother (who have separated) for the custody of two children of very tender age, issue of the marriage.'' This is sufficient to show that the case is not authority for the position assumed by the majority in this cause. As stated above, as between parties, neither has a superior right to the other, under our law. But it does not show that such would be the case between the father of the child and its maternal grandparents, claiming the custody of the child. As stated above, the duty to support the child rests primarily upon the father; and as a correlative of that duty, he is entitled to the custody of the child, and to its control, and to discipline it in a proper case. Discipline seems to be a vanishing quality in the scheme of things in these latter days. Nevertheless, from very ancient days to the present, discipline has been recognized as an essential part of a child's education, necessary to its welfare. No argument is needed to convince anyone that grandparents are more indulgent and less inclined to discipline in proper cases, than parents.

I fear that we have unsettled the law, and reached a conclusion that will trouble us in the future, because I can

see no way to harmonize the present decision with the many referred to, and quoted from above.

The judgment should be affirmed.