## Hutchins *v.* Moore, et ux.

No. 40558 November 4, 1957 97 So. 2d 748

*Breland & Whitten,* Sumner; *Prentice Oltorf,* Marlin, Texas, for appellant.

*Brewer & Brewer, Leon L. Porter, Jr.,* Clarksdale; *Joel W. Bunkley,* Oxford, for appellees.

McGEHEE, C. J.

This suit involves the custody of Lucy Carol Hutchins, who will be eleven years old on December 7, 1957. The appeal is by Grady L. Hutchins, Jr., the father of the child, from a decree of the Chancery Court of Coahoma County at Clarksdale, Mississippi, rendered on September 22, 1956, which appointed the appellees, E. P. Moore and his wife Mary J. Moore, who are the maternal grandparents of the child, the joint guardians of her person and estate, and awarded unto them her permanent custody.

The appellant is a career man and in the United States Navy. He has been a member of the Navy since 1942, and at the time of the rendition of the decree above mentioned he still had four and one-half years to serve in the Navy, at least two and one-half years of which he would be subject to call for service on a ship at sea, but would not necessarily be called for sea duty.

The appellant, Grady L. Hutchins, Jr. married Evelyn Moore on February 7, 1946. She was the daughter of the appellees and was born and reared at Clarksdale. The appellant and Evelyn Moore were at the time stationed at the U. S. Naval Air Base at Galveston, Texas. She belonged to the Waves. In May 1946 she withdrew from

the Navy, and she and the appellant continued to live at the naval base at Galveston until it was decommissioned in August of that year. Thereupon they went on a visit to his parents, Mr. and Mrs. Grady L. Hutchins, Sr., at San Antonio, Texas, in September 1946. From there they went to the home of the appellees at Clarksdale, where Evelyn remained until Lucy Carol Hutchins was born on December 7, 1946, and she and the baby continued to remain with her parents until February 1947, when they joined the appellant at a naval station at Orange, Texas, to which he had been assigned in the meantime. Evelyn and the baby remained with the appellant at Orange, Texas, until June of 1947, when she had to undergo an appendectomy. Thereupon the appellant's orders were changed and he was required to report at San Diego, California. The maternal grandfather of the child then went to Orange, Texas, and brought Evelyn and the baby to the home of the appellees at Clarksdale where she could recuperate from the operation.

The proof discloses without conflict that the appellant was willing for his wife and baby to join him at San Diego, but her father, E. P. Moore, one of the appellees, testified that his daughter Evelyn ''could not go to California''. He did not assign the reason, but at any rate the appellant received orders to go aboard a ship on the west coast, and from there he was away for a period of three months in the Mediterranean area, and during which time Evelyn and the baby made a visit to his parents at San Antonio, where he later went and returned with them to her parents' home in Clarksdale.

Upon the return of the appellant to the United States he was given orders to go to England, and at first it was understood that his wife was to accompany him, but she decided later not to go, and informed the appellant that she was considering the matter of obtaining a divorce. Thereupon the appellant was able to get a

transfer to a naval base in Florida instead of going on to England. He returned to Clarksdale from Norfolk, Virginia, had a discussion with Evelyn as to their differences, and then reported to her father, E. P. Moore, who was maintaining an office as a cotton buyer in Clarksdale, and informed her father that everything was straightened out and that his wife and baby were going with him to Florida.

While at the office of the appellee E. P. Moore, the telephone rang and it developed that it was Evelyn who was calling her father. The appellant testified that her father told Evelyn that if she didn't want to go to Florida that he wouldn't let her go or that she didn't have to go. However, the appellee E. P. Moore testified that when he answered the telephone his daughter Evelyn was crying and that she told him that things had not been straightened out between her and the appellant and that she did not want to go and take the baby to Florida, and that it was then that he told her that if she didn't want to go that he would not let her go.

Thereupon the appellant went to San Antonio, Texas, employed an attorney, and had a suit for divorce filed against his wife in Falls County at Marlin, Texas, where the appellant had been born and reared. In that suit for divorce the appellant asked that the custody of this child be awarded to its mother. She filed an answer in the case but did not ask for any financial relief either for herself or for the child. However, it was agreed among the attorneys for the respective parties that an allotment would be obtained from the United States Government of $35 per month for the support and maintenance of the child, payable to its mother. These allotment payments were regularly made to the mother until 1950, when they were increased by the United States Government to the sum of $77.10 per month, and were continued to be made to her until her death on December 24, 1955.

Thereafter the first two or three checks were returned to the Government since no one had been qualified to endorse the same and receive the money for the benefit of the child.

Thereafter the appellant filed an Ex Parte proceeding in Falls County, Texas, and obtained a decree for the allotment checks to be sent to him for the support of the child, but the United States Government thereafter sent the same to the appellees, in whose home at Clarksdale the child was then residing.

Prior to the death of the child's mother she was married to Leon L. Porter, Jr., an attorney at Clarksdale, in October 1952. Although the child had resided continuously with its maternal grandparents at Clarksdale from the granting of the divorce on December 27, 1948, and for sometime prior thereto, it went with its mother into the home of Leon L. Porter, upon the marriage of the mother to him in October 1952, and spent about half of the time in the Porter home and the other half in the home of its maternal grandparents at Clarksdale until the death of its mother on December 24, 1955, and thereupon it returned to the home of the appellees, its maternal grandparents at Clarksdale.

It was agreed in the family that Leon L. Porter would notify the child's natural father of Evelyn's death, but he failed to so notify the appellant until April 1956. At that time he wrote the appellant a letter to where he was then stationed at a naval base at Kingsville, Texas, and suggested that he permit the appellees to adopt the child as their own. Thereupon the appellant and his father, Grady L. Hutchins, Sr., went to Clarksdale to discuss the matter with the Moores, and he then refused to give his consent for their adoption of the child. In August of that year he filed a proceeding in the Falls County, Texas, court to be appointed guardian of the person and estate of the child, and on September 10, 1956, he obtained a decree from the said Texas court awarding to him

the guardianship of the person and estate of the child and of its permanent custody. Process was obtained upon the appallees by having a summons issued by the clerk of the Falls County court to them, and which process was served by the sheriff of Coahoma County after the said officer had received the process through the mail. The appellees did not appear in the court in Falls County, Texas, in response to such process, but filed a proceeding in their own right for the joint guardianship on their behalf of the person and estate of the child and were awarded such letter of guardianship and the permanent custody of the child by the Chancery Court of Coahoma County on September 22, 1956. In that suit the appellant entered his appearance and appeared at Clarksdale and testified at the trial. He filed as an exhibit to his answer and cross bill a certified copy of the proceedings in the Falls County, Texas, court, and pleaded the same in bar of the action by the appellees in the Chancery Court of Coahoma County, Mississippi, under the full faith and credit clause of the Federal Constitution, Article 4, Section 1, thereof.

The Chancery Court of Coahoma County rejected this plea in bar on the ground that although the domicile of the child may have reverted to its natural father in Falls County, Texas, upon the death of the child's mother on December 24, 1955, the court of Falls County, Texas, did not have territorial jurisdiction over the maternal grandparents at Clarksdale, where the child was physically present and was in the custody of the appellees, who stood in loco parentis to the child, and had so stood since the death of its mother on December 24, 1955.

The Chancery Court of Coahoma County, after a full hearing on the petition filed by the appellees for the guardianship of the person and estate of the minor and for its permanent custody, held (1) that the father had abandoned the child within the legal sense of that term, and (2) that in any event it was for the best interest and

welfare of the child that it should remain with its maternal grandparents. This appeal is from that decree.

■■■ At the trial in Coahoma County there were nine witnesses who testified on behalf of the petitioners, who were the maternal grandparents of the child as aforesaid. These witnesses consisted of the petitioners, Mr. and Mrs. E. P. Moore, Leon L. Porter, Jr., Dr. Van R. Burnham, the local physician of the child, Miss Mamie Vick, principal of the grammar school at Clarksdale where the child was in attendance, Rev. Garland Holleman, pastor of the child and of the petitioners, W. P. Patterson of Rome, Mississippi, who was married to the sister of the maternal grandmother, W. Y. Wilson and Mrs. Frances Shaifer, the latter two being nearby neighbors of the Moores at Clarksdale.

On the other hand, the witnesses for the appellant were, himself, his mother, Mrs. Grady L. Hutchins, Sr., Dr. E. P. Hutchins, a brother of the paternal grandfather, and Prentice Oltorf, attorney for the appellant.

The testimony showed without dispute that the appellee E. P. Moore is a successful cotton buyer who has been in business at Clarksdale since 1918, and who was 56 years of age. The amount of his annual income was not shown, but he was shown to be the owner of his own home, a three bedroom brick house, and on which he owed a loan which he said he had not paid off for the reason that it could be sold to better advantage with a loan on it than otherwise. Mrs. Mary J. Moore, the maternal grandmother of the child, was shown by the testimony of her husband to have an annual income of about $15,000, and it was shown by the witness Patterson, brother-in-law of the appellee Mrs. Moore, that she was receiving, along with the wife of the witness, about $12,000 per annum of the total of $15,000 income testified to by Mr. Moore, from oil properties in the State of Louisiana. Mrs. Moore was 52 years of age, and the Moores have no other children except an adult son who lives in Clarksdale,

outside of the Moore home, and takes his meals at the home of his father and mother, and another son who was away in the air force. The Moores testified that the child has a separate room of its own with a private bath, and it was shown by the child's teacher that she has made excellent grades in school and is a well adjusted and lovely child. It was shown by both the petitioners and pastor of her church that the child is a regular attendant at Sunday School and Church in Clarksdale. It was further shown by the deposition of Dr. Van R. Burnham that at the age of this child it would be detrimental to its welfare and happiness for it to be taken away from its maternal grandparents and sent to San Antonio, Texas, among strangers, the child having never seen its paternal grandparents since it was about one year old, and never having been seen by its father, the appellant, but one time, subsequent to the divorce of the appellant and the child's mother on December 27, 1948.

The other witnesses for the appellees testified in substance that the child was fortunate in having a home with its maternal grandparents.

The child's father was shown to be of good moral character and to have had an unobjectionable record as a serviceman in the Navy. The paternal grandfather, Grady L. Hutchins, Sr., was making at the time of the trial a salary of $140 per month in addition to certain benefits that he received as an ex-serviceman from World War I; that the paternal grandmother was working at the time of the trial and making a salary of $120 per month, and that these paternal grandparents own their own home, and onto which they proposed to build an additional room to enable them to properly care for this child.

Dr. E. P. Hutchins is a widower with no children and owns an estate worth approximately $200,000. The paternal grandfather is his only brother and nearest of kin, and the doctor testified that he would assist the child's paternal grandparents in adding a room to their

home and would do everything that he could to help them care for the child, and he testified that the appellant was of good moral character and a suitable person to have the care and custody of his child. The attorney of the appellant also testified as to his good moral character.

The father of the child has never actually provided a home for this child except between the months of February and June of 1947. After he spent one year at a naval base in Florida following the divorce suit he spent about three months in Washington, D. C., two years in Corpus Christi, Texas, three years at sea, and had been residing at a naval base at Kingsville, Texas, for the three year period immediately preceding the trial of the instant case.

The paternal grandmother appeared and testified at the trial in Clarksdale as aforesaid, and she proposed that she and her husband would either take care of the child in their own home at San Antonio, Texas, or that she would quit her salaried position and go to Kingsville, Texas, and help her son to take care of the child at the naval station there if he wanted her to do so.

The appellant does not have a home at all and he merely proposes to provide a home for the child in the home of his own parents, or in a home that his mother may keep for the child at the naval base at Kingsville, Texas. Evidently the chancellor did not think that it was to the best interest of this child, at its present age, to be placed among total strangers at a naval base, and especially so when the child's father testified that he had four and one-half more years of service in the Navy and that he could be required to spend two and one-half years of this time at sea. In substance the proceeding amounts to a contest as to whether or not the child should be taken from its maternal grandparents and placed in the care and custody of its paternal grandparents or one of them. We are of the opinion that the chancellor was amply war-

ranted in finding that it was to the best interest of the child that it should remain with its maternal grandparents.

It is undisputed that aside from spending the period of time from February 1947 to June 1947 with the child and its mother, the father has spent very little of the child's lifetime with her. He made a thirty day visit and later a ten day one to Clarksdale prior to obtaining the divorce from his wife on December 27, 1948. Thereafter he made a three day visit to Clarksdale in 1956, and saw the child while there, while on a mission to regain its custody. He sent the child from time to time birthday and Christmas gifts, of a value not shown, and also sent it birthday, Valentine and Christmas greeting cards. He contributed no money for the support and maintenance of the child from his own compensation in the Navy. The allotments from the United States Government were in addition to the compensation that the father would have received, if he had had no child, while engaged in the naval service. The chancellor found as a fact that the father of the child had abandoned her, since he had seen her only one time from December 27, 1948, and for some time prior thereto, until the date of the trial on September 22, 1956, and had contributed nothing in money from his own compensation of $240 per month in the Navy during that time. At any rate, we think that the chancellor was eminently correct in finding that the happiness, best interest and welfare of this child would be better served by allowing her to remain with her maternal grandparents.

██ ██ This brings us to a consideration of the law that should govern in the case. It is true that under the Texas court decisions the domicile of this child reverted to its father at the death of its mother on December 24, 1955, ██ ██ but under this technical concept of the legal domicile of the child without regard to where it has actually resided most of its entire life, this Court should not give full faith and credit to the decrees ren-

dered by the Texas court on September 10, 1956, for the reason that the court there did not have territorial jurisdiction over the maternal grandparents at Clarksdale, Mississippi, who entered no appearance in the Texas court and were not served with process except by a service on them of a summons which had been mailed from the Texas court to the sheriff of Coahoma County, and at a time when both the child and its maternal grandparents were physically present in Clarksdale, Mississippi. This was true both when the Texas proceedings were filed, and also when the decrees of September 10, 1956, were rendered by the Texas court.

The appellant relies strongly upon the case of Peacock v. Bradshaw, (Texas) 194 S. W. 2d 551, and a number of other Texas court decisions, but the defendants had made an appearance in court in the case of Peacock v. Bradshaw, supra, and it is not disclosed that in the other Texas desisions relied upon by the appellant as to the full faith and credit to be given to the judgment and decrees of that court, that the court had no territorial jurisdiction of the parties.

Moreover, in the case of Baskin v. Montedonico, (Tenn.) 115 Fed. 2d, 837, the court said: "Where jurisdiction of a foreign court or that of a state is brought into question in a suit in courts of another state or sovereignty, the law of the forum is controlling upon the question of jurisdiction of the court rendering the judgment."

And in the recent case of May v. Anderson, 345 U. S. 528, 97 L. Ed. 1221, 73 S. Ct. 840 (decided in 1953) the Supreme Court of the United States stated: "We find it unnecessary to determine the children's domicile because, even if it be with their father, that does not give Wisconsin, certainly as against Ohio, the personal jurisdiction that it must have in order to deprive their mother of her personal right to their immediate possession."

Judge Cardoza said in the case of Finlay v. Finlay, 240 N. Y. 429, 148 N. E. 624 (1925), the following: ''The jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of its parents. It has its origin in the protection that is due to the incompetent and helpless * * *. For this, the residence of the child suffices, though the domicile be elsewhere.''

Again we find in the case of Halvey v. Halvey, 330 U. S. 610, 91 L. Ed. 1133 (1947), that Justice Frankfurter in his concurring opinion stated among other things that: ''The scope of the Full Faith and Credit Clause is bounded by its underlying policy and not by procedural considerations unrelated to it. Thus in judgments affecting domestic relations technical questions of 'finality' as to alimony and custody seem to me irrelevant in deciding the respect to be accorded by a state to a valid prior judgment touching custody and alimony rendered by another state.''

 We deem it to be well settled in this state that in order for our courts to be required to give full faith and credit to the judgments, decrees, and decisions of the court of another state, the court of the foreign state must have had jurisdiction both of the subject matter and territorial jurisdiction of the parties. The law of the forum where this case was tried at Clarksdale would prevent any judgment of a foreign state to be binding upon parties residing in this state, where such foreign judgment was rendered merely on constructive service of process, and where there had been no answer or other pleading filed by the resident of this state and where he has not otherwise entered an appearance in the court of the foreign state.

However, the appellant contends that aside from the decrees of September 10, 1956, in Falls County, Texas, he should have been awarded the custody of this child at the trial in Clarksdale on September 22, 1956, under and

by virtue of the decisions of the Mississippi State Supreme Court. The appellant relies upon the text of Amis Divorce and Separation in Mississippi, Section 212, which states, among other things: "In all contests between a parent and other persons this presumption (that it is to the best interest of a child for it to be in the custody of its natural parent) is conclusive unless it be clearly shown that by reason of immoral conduct or vicious habits the parent is an unsuitable person to have the custody, or has forfeited the right to custody by reason of having abandoned it." The author cites in support of this text, among other cases, that of Hibbette v. Baines, 78 Miss. 695, 29 So. 80. But we fail to find, after a second reading within the past few days of the opinion in Hibbette v. Baines, supra, that the word "conclusively" is used anywhere therein in connection with it being presumed that it is to the best interest of a child that its custody should be with the natural parent, unless such parent is shown to be an unsuitable person to have the custody, or has forfeited the right of custody by reason of having abandoned it.

In the case of Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81, relied on by the appellant, this Court quoted from Hibbette v. Baines, supra, the following: "Because he is the father, the presumption naturally and legally is that he will love them most, and care for them most wisely. And, as a consequence of this, it is presumed to be for the real interest of the child that it should be in the custody of its father as against collateral relatives, and he, therefore, who seeks to withhold the custody against the natural and legal presumption, has the burden of showing clearly that the father is an unsuitable person to have the custody of his child; or that, however moral a man he may be, he had abandoned his child, contributing nothing to its support, taking no interest in it, and permitting it to remain continuously in the custody of others, substituting such others in his own place so that they stand

in loco parentis to the child, and continuing this condition of affairs of so long a time that the affections of the child and of the foster parents have become mutually engaged to the extent that a severance of this relationship would surely result in destroying the best interest of the child. In such case as this, the law, and it may well be said nature, too, denies to the father the custody of the child, but the denial is based not at all on any contract, but entirely and solely upon the situation above stated, following the abandonment of the child by the father. There is much loose talk in the books about the best interest of the child, and more as to the right of the father. In the effort to escape from the arbitrary rule laid down by the common law as to the father's right, the danger is lest the pendulum swing too far, under modern decisions, the other way.''

In the more recent case of Forbes v. Warren, 184 Miss. 526, 186 So. 325, Warren, the father of a minor girl fourteen years of age, brought a habeas corpus proceeding in the Chancery Court of Marion County against the appellants, Mr. and Mrs. A. S. Forbes, the maternal grandparents of the child, to recover her custody. The trial court found as a fact that Warren, the father of the child, had not abandoned her, and that Warren and his second wife were both suitable persons to have the custody of the child, and its custody was awarded to them by the trial court. Upon appeal by the maternal grandparents this Court recognized that the child's father and his second wife, on the one hand, and Mr. and Mrs. Forbes, on the other, were all suitable persons to have the custody of the child, but awarded its custody to its maternal grandparents, Mr. and Mrs. Forbes, who had reared the child in their home and kept it in their custody from its birth until the date of the trial. The child's father, Warren, had spent several years as a railroad man in Louisiana, Arkansas, and Texas, but had quit railroad work in 1934, about four years prior to the decision of this Court,

and had bought a small farm in Marion County. The second wife of Warren was a school teacher, and was deemed to be a suitable person to have the care and custody of this child along with its father. This Court said, among other things, that "There is no substantial conflict in the evidence that the happiness, welfare and best interests of the child are with her grandparents, and not with her father and stepmother. The question is, whether those considerations should be controlling, under the facts of this particular case. We are of the opinion that they should be. It is true that, everything else being equal, the father is entitled to the custody of his child. Nevertheless, 'The welfare of the child or children is the matter of chief importance; and the consideration of their welfare will prevail over any mere preponderance of legal right in one or the other party * * *. The age, sex and physical condition of the child are often important elements in determining what custody would be for its best welfare. * * *.''

The Court in the case of Forbes v. Warren, supra, made no reference in its opinion to the question of whether or not the father of the child had abandoned her, as found by the chancellor that he had not done. The decision of this Court was based solely on the ground that it was to the best interest and welfare of the child that it should remain with its grandparents. We adopt the same course in this case and place our affirmance of the decree appealed from on the ground that the chancellor was correct in finding that the happiness, best interest and welfare of the child would be better promoted by leaving it with its maternal grandparents. The Forbes v. Warren case was decided by the Court in banc, and there was only one dissent therefrom.

We are clearly satisfied under all the proof contained in this record that it is decidedly to the best interest of this child that it should remain with its maternal grand-

parents instead of being placed with its paternal grand-parents.

In the case of Clark v. Davis, 197 Miss. 135, 19 So. 2d 500, this Court held that on the death of the mother the custody of a child would not be taken from the maternal gransparents with whom the mother and the child were living at the time of the mother's death and given to the paternal grandparents *upon the father's application,* where due to the father's military service he could not possibly have personal custody of the child.

In the instant case the natural father has not remarried, has no home of his own, and has not provided a home, except with his parents, for this child.

The appellant in his brief states: "The proof shows that the minor child in question is receiving, at the hands of the Moores, all of the attention and care required for the rearing of the child. The proof also shows that the appellees, the minor child's (maternal) grandparents, have great affection for this child, and that the nine year old child also loves its grandparents, and apparently has the same feeling for them that it would if they were her own parents." And it is elsewhere stated in the appellant's brief that the paternal grandparents "are able and willing for their son's child to live with them in their home in San Antonio, Texas, which is near the naval station (150 miles away) where their son is located". And referring to the testimony of the paternal grandmother the appellant states in his brief that "if her son wanted her to do so she would look after his child wherever he was stationed", and that "she and her husband would do everything that they could do to help her son make a home for his child."

Without further detailing the facts in the instant case we have concluded that the decree of the Chancery Court of Coahoma County awarding the custody of the child to the appellees, should be affirmed and without regard

to whether or not the proof is sufficient to show that the father had abandoned it.

Affirmed.

*Hall, Lee, Holmes* and *Ethridge, JJ.,* concur.