## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-01246-SCT

*DAVID JOHN WEIGAND*

*v.*

*MACHELLE "GIL" WEIGAND HOUGHTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/1997 |
| TRIAL JUDGE: | HON. PERCY LEE LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT B. McDUFF |
| | ALISON R. STEINER |
| | ELIZABETH JANE HICKS |
| | MICHAEL ADAMS |
| | JENNIFER MIDDLETON |
| ATTORNEY FOR APPELLEE: | PRO SE |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 02/04/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**


**ROBERTS, JUSTICE, FOR THE COURT:**


### STATEMENT OF THE CASE

¶1. On May 9, 1997, David Weigand (herinafter "David") filed a petition for modification of the custody and visitation order in effect with regard to his son, Paul Weigand (hereinafter "Paul") in the Chancery Court of Desoto County, Honorable Percy Lee Lynchard, Jr. presiding. Because the original divorce decree was entered by the District Court of Shawnee County, Kansas, David petitioned the chancery court for enrollment of a foreign divorce decree at the same time. The Opinion of the Court, denying the petition for custody modification, was filed on June 17, 1997. In light of new evidence which David found quite important to the case, he filed a Motion for New Trial and Motion to Alter or Amend Judgment, which was heard on August 19, 1997. That motion was denied by the chancellor in an order filed on September 9, 1997. On October 9, 1997, David filed a Notice of Appeal. On December 8, 1997, David filed a Motion For Injunctive Relief Pending Appeal with the chancery court. That motion was denied by the chancery

court in an Order filed on December 22, 1997. David asserts four issues on appeal to the Supreme Court:

**I. WHETHER THIS COURT IS REQUIRED TO GIVE DEFERENCE TO THE CHANCELLOR'S FINDING CONCERNING THE BEST INTEREST OF THE CHILD WHEN THE CHANCELLOR RELIED ON AN ERRONEOUS VIEW OF THE LAW AND MISAPPLIED THE ALBRIGHT FACTORS?**

**II. WHETHER THE CHANCELLOR ERRED WHEN HE FOUND THAT MODIFICATION OF CUSTODY WAS NOT IN PAUL'S BEST INTEREST?**

**III. WHETHER THE CHANCELLOR'S *SUA SPONTE* ORDER THAT ALL VISITATION BETWEEN DAVID AND PAUL OCCUR OUTSIDE THE PRESENCE OF DAVID'S LIFE PARTNER IS LEGAL ERROR AND REQUIRES REVERSAL?**

**IV. WHETHER THE CHANCERY COURT'S RULING REQUIRES REVERSAL AND AN IMMEDIATE TRANSFER OF CUSTODY OF PAUL TO HIS FATHER, DAVID?**

## STATEMENT OF THE FACTS

¶2. On November 23, 1987, a divorce was awarded unto David by the District Court of Shawnee County, Kansas, Division 11, in Cause No. 87-D-8111. The District Court awarded the joint legal custody of Paul to both parties with "residential custody" being alternated between the parties until such time as the minor child reached school age. It further provided that at the time the minor child reached school age, the residential custody would be vested with David during the school year and with Machelle during the remaining months. Subsequently, on June 2, 1988, an order modifying that decree was entered by the same court whereby the parties were granted joint custody of the minor child with Machelle having the residential custody of the child. David is presently seeking modification of the prior decrees enrolled in this cause. The requested relief by way of modification includes an award of full care, custody and control of the minor child of the parties subject only to the reasonable and liberal rights of visitation to Machelle, an order terminating his duty of support payments for the benefit of Paul as earlier awarded, an assessment of support on behalf of Machelle to be paid to him for the care, support and maintenance of the minor child and finally an order directing Machelle to turn over to David all of Paul's personal property. At the trial of this cause, David testified and produced nine witnesses in support of his request for modification of the provisions of child custody. Machelle testified on her own behalf and called no other witnesses. Furthermore, it is important to note that Machelle did not file a brief in response to David's appeal to the Supreme Court; however, her letter is in the nature of a response and is considered accordingly. Also, David does not dispute the chancellor's finding of facts. After a thorough review of the record, this Court agrees with the chancellor's finding of facts and has adopted them.

¶3. David is a forty-one (41) year old resident of Lake Forest, California. He has resided in the state of California since January of 1994 and is employed as a property manager at this time. He resides in a five bedroom home in an upscale neighborhood and earns a gross annual salary of approximately $40,000.00.

¶4. Following the divorce of the parties in 1987, the minor child resided with David for a period of less than one year. At that time, because he felt that his lifestyle as a single person was not conducive to the rearing of a minor child, he relinquished physical custody of Paul to Machelle. David has throughout the post-divorce period of his life consistently exercised visitation with Paul, having him at his home in California for

extended weeks during the summer. David expresses a love and affection for Paul which was unquestioned by the chancellor. He has seen to Paul's needs during the period of time in which Paul has lived with him by furnishing him with not only the necessities of life, but also providing him with certain luxuries including access and use of a home computer which Paul enjoys, availability of an "800" number for the child to contact him at any time he desires, accompanying the child to museums, dinners, shopping and amusement parks as well as other extracurricular activities. He has consistently encouraged Paul to develop his writing skills for which the child shows a talent. David expressed a desire for Paul to receive the highest quality education possible.

¶5. In anticipation of Paul coming to live with David, should David be successful in this modification, David has remodeled and refurbished Paul's room at his home, thoroughly investigated the local school system as well as a local university, and purchased computer and word processing programs for Paul to enhance his writing skills. David also sought information concerning Paul's publication of short stories he has written, which publication would enhance the possibility of Paul's admission to the university program.

¶6. David openly and freely admits to engaging in a homosexual lifestyle for a number of years. He presently resides in a jointly owned home with his life partner of eight years, Wayne Fields. Although prohibited from marrying under California law, David and Wayne have entered into a living trust agreement and domestic partnership agreement, holding themselves out as a couple and describing their relationship as monogamous. According to David, they regularly engage in homosexual activities which include both oral and anal intercourse. However, they described their sexual relations, as well as their open affections between each other, at least in the presence of the child, to be discreet and performed only behind closed and locked doors.

¶7. When Paul was examined in chambers by counsel for both parties as well as the chancellor, he acknowledged that he had been previously embarrassed when he appeared in public with both his father and Wayne "while here in the South." He further indicated that a show of affection between the two might bother him and "definitely would bother me" if any of his friends were present when that affection was shown. While on vacation trips with his father and Wayne, Paul slept in the same hotel room with the two, sleeping in his own bed while David and Wayne slept in the adjacent bed. Paul also indicated that he would be uncomfortable if he believed himself to be a homosexual because of his religious beliefs. He stated that he believed the relationship between his father and Wayne was wrong.

¶8. Paul is an "A" student with no behavioral problems. He presently resides in the custody of his mother and his stepfather, Jeff Houghton, formerly convicted of felony assault and theft in the state of Kansas. He routinely attends the First Baptist Church in Horn Lake, Mississippi. Although of a sufficient age in which he may voice a preference for the parent with whom he would desire to reside, Paul has expressed no clear choice, testifying that he wanted to continue to reside with his mother yet he had a desire to live with his father in California as well. However, Paul did testify that if the recent stress in his home following his stepfather's accident had not occurred, he would not have been interested in moving in with his father, David.

¶9. David seeks a change of custody based upon a material and substantial change in the circumstances of the parties which adversely affects Paul. In support of this he testified that the present custodial situation is exposing Paul to mental and emotional abuse as a consequence of the volatile relationship between Paul's mother and stepfather. As evidence David points to two separate incidents of domestic disturbance

involving Machelle and Jeff. On November 4, 1996, Jeff was arrested for disturbance of family and simple assault by the Horn Lake Police Department. This was a result of a domestic disturbance occurring at the home of the parties in which Jeff caused physical injury to Machelle by striking her in the face. As a result of this incident he was subsequently convicted by the municipal court on a charge of simple assault after the entry of a plea of guilty. As a result of this incident, Jeff was sentenced to complete a course in anger management. Subsequently on January 11, 1997, Jeff was again arrested at the family home following an altercation between the parties. As a result of that incident the charge of disturbance of family was remanded and he was convicted of the charges of public drunk and malicious mischief. The use of alcohol by him was also present at this incident.

¶10. Both of the above incidents occurred while Paul was present and apparently greatly disturbed him. The latter incident resulted in Paul himself summoning the police following a 911 emergency call. It is apparent from the testimony of Paul that the relationship between his mother and Jeff is explosive at times, but Paul acknowledges that he has never personally been physically abused by his stepfather.

¶11. Machelle testified in her own behalf. She testified that she had no idea that there was any problem perceived by David in the custody arrangement until she received a letter of March 19, 1997, where David indicated a desire to seek the physical custody of Paul. She further testified that she assisted Paul in school, including extracurricular activities such as the BETA club. She has in recent months begun sending Paul to the First Baptist Church. Both she and Jeff, along with Paul, attend regularly. She is employed at two separate jobs, Wal-Mart and Federal Express, working an average of 50-52 hours per week at both jobs. She admits that the time with the child is limited now because of her two jobs but has intentions of resigning one in August of this year.

¶12. Machelle admits that her relationship and home situation with her current husband has placed a strain on her relationship with Paul. In May of 1996 Jeff was seriously injured in an automobile accident in Memphis, Tennessee and has since been unable to work causing severe financial strain on the family as a result of his absent income and excessive medical bills. Jeff's depression because of his inability to work has caused a strain on the relationship between both him and Machelle as well as he and the child.

¶13. Machelle acknowledged the two incidents as testified by David which involve the arrest of Jeff, but believes them to be isolated incidents which she does not anticipate reoccurring. She is expecting her second child and believes this her third marriage to be stable at this time.

## DISCUSSION OF THE ISSUES

**I. WHETHER THIS COURT IS REQUIRED TO GIVE DEFERENCE TO THE CHANCELLOR'S FINDING CONCERNING THE BEST INTEREST OF THE CHILD WHEN THE CHANCELLOR RELIED ON AN ERRONEOUS VIEW OF THE LAW AND MISAPPLIED THE ALBRIGHT FACTORS?**

**II. WHETHER THE CHANCELLOR ERRED WHEN HE FOUND THAT MODIFICATION OF CUSTODY WAS NOT IN PAUL'S BEST INTEREST?**

¶14. The standard of review this Court invokes in a child custody case is well-settled. The review is "quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse." *Wright v. Stanley*, 700 So. 2d 274, 280 (Miss.1997) (*citing*

***Williams v. Williams***, 656 So. 2d 325, 330 (Miss.1995)). This Court will not disturb the findings of a chancellor, "'. . . be they of ultimate fact or of evidentiary fact,'" when supported by substantial evidence in the record. ***Smith v. Jones***, 654 So. 2d 480, 485 (Miss.1995) (*quoting **Cooper v. Crabb***, 587 So. 2d 236, 239 (Miss.1991)).

¶15. This Court has stated that: "[t]he prerequisites to a child custody modification are: (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody." ***Smith v. Jones***, 654 So. 2d 480, 486 (Miss.1995). In order for this Court to say that the chancellor has not abused his discretion in these matters, there must be sufficient evidence to support his conclusions. ***Id.*** This Court has also noted that "[t]he 'totality of the circumstances' must be considered." ***Ash v. Ash***, 622 So. 2d 1264, 1266 (Miss.1993) (*citing **Tucker v. Tucker***, 453 So. 2d 1294, 1297 (Miss.1984)).

¶16. "In all child custody cases, the polestar consideration is the best interest of the child." ***Sellers v. Sellers***, 638 So. 2d 481, 485 (Miss.1994). There are a number of factors that should be considered by chancellors in weighing decisions regarding custody:

> The age of the child is ... but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

***Id.*** (*quoting **Albright v. Albright***, 437 So. 2d 1003, 1005 (Miss.1983)).

¶17. The lower court issued a thirty-page opinion in the case sub judice, of which twenty-eight pages were devoted to the issue of Paul's custody. Having found that there had been a substantial and material change in circumstances which adversely affected Paul's welfare, the chancellor addressed and analyzed each of the ***Albright*** factors before determining that it was in the best interest of Paul to remain in the custody of his mother, Machelle.

¶18. The chancellor noted that Paul, being almost fourteen (14) years of age, was of such an age that he could by statute express a preference for the parent with whom he wished to live, under certain conditions. As Paul exhibited no specific preference, this factor is of some consequence, as it tends to support maintaining the status quo. There was no testimonial or documentary evidence to suggest that the health of Paul favored either parent. The chancellor noted that Machelle had continuously cared for Paul since 1988 and, thus this factor clearly rested with the mother. The chancellor did not find that one parent had better parenting skills than the other. This factor favored neither parent, but appears to support maintaining the status quo as Paul expressed no opposition thereto.

¶19. The chancellor also noted that the employment responsibilities of Machelle hindered her relationship with Paul. Conversely, he found that the employment responsibilities of David working an average work week were more conducive to a good relationship toward Paul leaving this factor in favor of David. The

chancellor found that both parties were in good physical condition.

¶20. The chancellor found that both parents exhibit a great love and affection for Paul which is reciprocal from the child to both parents. However, the factor of the home, school and community record of Paul lies clearly in favor of Machelle because of the continuity of care which she has had with Paul. This is evidenced by Paul's excelling in school, participation in extracurricular activities as well as church attendance.

¶21. Because of the incidents of domestic violence, and the recent eviction of Machelle from her apartment complex as a direct result of that domestic violence, the stability of the home lies more heavily with David.

¶22. The factor of the moral fitness of the parents did cause the greatest concern with the chancellor. David, an admitted homosexual who lives with and engages in sexual activities with another an on a day-to-day basis, obviously has concerns that his homosexual activity and his show of affection between him and his life partner may, at least at this point in Paul's life, have an adverse effect upon Paul. He admits that a heterosexual lifestyle would have no adverse effect, while acknowledging that a homosexual lifestyle or homosexual activity may well have the opposite effect. The chancellor also felt that David placed far too much emphasis on Paul's own decisions without any guidance whatsoever. David further admits that an open sign of affection between homosexual partners is not proper for the child at this age, yet despite refraining from that activity, he merely retreats behind closed and locked door hiding and secreting his own sexuality from Paul. Although the morality of David's lifestyle was one important factor to consider in the eyes of the chancellor, this was not the sole basis for his custody decision.

¶23. Lastly, the chancellor considered the issue of religious training towards the development of a child. He noted that the mother has seen that Paul is taken to church and undergone religious training, along with the entire family. The chancellor determined that Paul's best interest would be served by providing religious training. The chancellor further stated that the acceptance or rejection of religious beliefs obtained through the church will be the discretion of Paul, but one could hardly argue that his best interest will be served by not presenting that opportunity to him. Because Machelle has seen fit to provide that training for Paul and make that available to him, the chancellor weighed this factor heavily in her favor.

¶24. In weighing a request for modification of child custody, a chancellor's ultimate concern must always be whether such change would be in the child's best interest. ***Riley v. Doerner***, 677 So. 2d 740, 745 (Miss. 1996). After examining all the factors as set forth in Albright, the chancellor found that despite the fact that there has been substantial and material changes in circumstances since the modification of the Kansas decree in 1988, the best interest of the child, would be served by leaving Paul in the actual physical custody of Machelle. On this record, this Court cannot say that the chancellor was manifestly wrong in denying David's petition for modification to change child custody and the chancellor's judgment should be affirmed.

¶25. Based upon this reasoning, Issue IV is moot and will not be addressed.

### III. WHETHER THE CHANCELLOR'S *SUA SPONTE* ORDER THAT ALL VISITATION BETWEEN DAVID AND PAUL OCCUR OUTSIDE THE PRESENCE OF DAVID'S LIFE PARTNER IS LEGAL ERROR AND REQUIRES REVERSAL?

¶26. David next asserts that the chancellor's order banning visitation between David and Paul in the presence of David's life partner, Wayne, burdens and violates the fundamental right of both father and son to an ongoing relationship.

¶27. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon."*Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994) (citing *White v. Thompson*, 569 So. 2d 1181 (Miss. 1990)). "When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child."*Harrington*, 648 So. 2d at 545. This Court will not reverse a chancellor's findings of fact so long as they are supported by substantial evidence in the record. *Tedford v. Dempsey*, 437 So. 2d 410, 417 (Miss. 1983). However, this Court "will reverse when he is manifestly in error in his finding of fact or has abused his discretion." *Hammett v. Woods*, 602 So. 2d 825, 828 (Miss. 1992).

¶28. This Court will follow the reasoning set out in *Harrington v. Harrington*, 648 So. 2d 543 (Miss. 1994), in which this Court reversed a chancellor's decision to restrict visitation by a natural father who cohabitated without the benefit of marriage with a woman. The Court reasoned that there was no evidence that the children were confused by the father's actions in so cohabitating. In the case sub judice, even if Paul is embarrassed, or does not like the living arrangement of his father, this is not the type of harm that rises to the level necessary to place such restrictions on David's visitation with his son. *Harrington*, 648 So. 2d at 547. Paul's present age of fifteen affords him considerable input as to visitation and it seems obvious that he wishes to continue the same arrangement. Therefore, we reverse and render the chancellor as to this issue and reinstate the visitation as per the chancellor's order but without any restrictions.

## CONCLUSION

¶29. In weighing a request for modification of child custody, a chancellor's ultimate concern must always be whether such change would be in the child's best interest. In this case, the chancellor's decision to deny transfer of Paul's custody from his mother to his father best served Paul's welfare. However, this Court believes that the restriction placed upon David's visitation rights was an abuse of discretion requiring reversal.

¶30. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PRATHER, C.J., PITTMAN, P.J., SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY SULLIVAN, P.J. BANKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J.**

**McRAE, JUSTICE, DISSENTING:**

¶31. The chancellor and majority believe a minor is best served by living in an explosive environment in which the unemployed stepfather is a convicted felon, drinker, drug-taker, adulterer, wife-beater, and child-threatener, and in which the mother has been transitory, works two jobs, and has limited time with the child. The chancellor makes such a decision despite the fact that Paul's father has a good job, a stable home, and

does all within his power to care for his son. The chancellor and majority are blinded by the fact that Paul's father is gay. Such should not be the issue. The issue is that Paul is living in a psychologically and physically dangerous environment from which he should be saved not blindly forced to remain. I dissent.

¶32. From the facts of this case, it is disturbingly clear that the majority, like the chancellor, has based its opinion neither on what is in the best interest of the child nor the law of child custody but on its own moral perceptions of human sexuality. The morality of homosexuality, however, should not be at issue before this Court or the lower court. Rather, the polestar consideration to which we are bound by the law to follow is whether a custody decision is in the best interests of the child.

¶33. Given the explosive environment the chancellor and the majority have found suitable for young Paul Weigand, it is apparent that the decision is more a condemnation of David Weigand's lifestyle than a consideration of his son's best interests. The chancellor even stated that David "expresses a love and affection for the child which is unquestioned by this Court." Yet, the chancellor ordered the child to remain in the custody of his mother and explosive stepfather. Thus, while the child could be living with his father in a safe and stable home with every material and educational opportunity, today's decision affirms the chancellor's finding that he should remain with his mother and her present husband, an adulterer and convicted felon, who has beaten Machelle and threatened Paul's life. No child should be subjected to such a potential for short- and long-term psychological and physical abuse just because the chancellor thinks little of homosexuals. It boggles the mind how the chancellor and this Court thus could deem it in Paul's best interest to remain in his mother's custody.

¶34. The majority dutifully recites the very basic premise of domestic law that the chancellor's ultimate concern in weighing a request for modification of child custody is whether the requested change is in the child's best interest. *Riley v. Doerner*, 677 So. 2d 740, 745 (Miss. 1996). Yet, the majority holds that "the chancellor's decision to deny transfer of Paul's custody from his mother to his father best served Paul's welfare." How can the majority say that the decision is in Paul's best interest given the facts of the case?

¶35. Indeed, today's decision leaves the youth vulnerable to both psychological and physical harm. Paul's mother, Machelle married and divorced a convicted felon, then married her current husband, Jeff Houghton. Jeff, Paul's stepfather, is a convicted felon who, according to the trial testimony, was in arrearage for past due child support. Paul's stepfather also has been arrested for hitting Paul's mother in the face, swelling her eye, while Paul was in his bedroom. In another incident, in which Paul's stepfather was intoxicated and knocked out the driver's side window of a car driven by Machelle, Paul again was present. Paul screamed and his stepfather told Paul that he (the stepfather) was going to kill Paul. Paul ran to the house and called 911. Another time, Paul's mother and stepfather were arguing when he told them he was going to the library, but he actually went to a gas station, called his father, and told him that he wanted to move to California and live with him.

¶36. Further, the family moved from Kansas; once in Mississippi, the family was evicted from the apartment complex in which they lived because of the stepfather's violent behavior. The Gateway Apartments resident manager, Sue Hosey, testified that Paul was really afraid and stayed in the apartment most of the time. Hosey testified that she feared for Paul's life. Hosey further testified:

> We hate for anyone to move, but I really feared for Machelle's life. This man had beat her so many times, you know, that it was unreal. And I told her, I said, 'Machelle, due to the circumstances', I said, 'if he kills you I don't want this on my conscious [sic] and I think it would be best if you moved.'

¶37. There is evidence that Paul's stepfather drinks heavily, sometimes unreasonably mixing alcohol with prescription pain medication. He entered a guilty plea in 1997 for possession of marijuana, careless driving, and driving without headlights. Further, Paul is aware that his stepfather has been involved in an adulterous relationship since his marriage to Machelle. In May, 1996, Jeff was injured in a one-vehicle accident which rendered him unable to work, causing financial strain on the family. Machelle consequently worked two jobs at the time of trial, averaging fifty to fifty-two hours per week, which admittedly limits her time with her son and effectually making the stepfather the primary care-giver. Indeed, Machelle testified at trial that Jeff—the drunken, wife-beating, convicted felon—takes Paul to and picks him up from school, cooks for Paul, does the housework, and does the cleaning and washing.

¶38. Paul is bright and not sufficiently challenged in the school he now attends; his father has provided Paul a home computer, has set up an "800" number with which he can keep the lines of communication open with his son, actively encourages Paul to develop his writing talent, and has sought the best California and Mississippi-area schools to provide Paul the highest quality education possible in. David has even offered to take out an $8,000.00 loan to send Paul to a private school, the Memphis University School, to provide him a more challenging academic environment while he resides with his mother and stepfather. While Paul chose not to decide with which parent he wishes to live, he has stated that he is attracted by the material benefits of being in California with his father. David owns his own home, has a stable job, and does all a non-custodial parent can do to care for his child. Yet, regarding his stepfather and current living arrangement, Paul stated to the chancellor that "he does have a bad temper . . . ." Further, Paul has recently received disciplinary marks regarding his conduct, despite the majority's comment that he has no behavioral problems. Paul also stated that his mother has tape recorded his conversations with his father, and that she has read his mail.

¶39. The chancellor, nevertheless, states that "it is apparent" that it is in Paul's best interest to remain with Machelle. But, how can it be so clear? Under the chancellor's thirteen-factor totality of the circumstances test articulated in *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983), the analysis is basically inconsequential. Hence, we are faced with the critical issue in this case.

¶40. The majority states that "[a]lthough the morality of David's lifestyle was one important factor to consider in the eyes of the chancellor, this was not the sole basis for his custody decision." How can this be? Each party was deemed to have basically the same number of *Albright* factors in its favor. Given the facts of this case, it is obvious that the key issue in the mind of the chancellor, if not the majority, is that of David's sexual orientation. David is openly gay. Paul even is aware of his father's orientation. The chancellor spent twelve pages analyzing the *Albright* factors, seven of which are dedicated to the single issue of David's homosexuality. This Court imprudently states that David's sexual orientation was not the sole basis for the chancellor's custody decision. To the contrary, it is obvious that David's homosexuality was the sole basis for the chancellor's decision to decline the father's request and hold that the mother (and stepfather) should retain custody:

> (12) Moral fitness of the parents: It is this factor above all others which causes the greatest concern with the Court. The natural father is an admitted homosexual who lives with and engages in sexual activities with another man on a day-to-day basis.
>
> . . . .

. . . [T]he fact that the Plaintiff and his "life partner" engage in sexual activity which include both oral or anal intercourse is repugnant to this Court as constituting a felony act under the laws of this state. Section 97-29-59 of the Mississippi Code Annotated (1972 as amended) prohibits unnatural intercourse and provides as follows:

"Every person who shall be convicted of the detestable and abominable crime against nature committed with mankind or with a best, shall be punished by imprisonment in the penitentiary for a term of not more than ten years."

Under Mississippi law, oral intercourse or fellatio violates the statute.[1] *Miller vs. State*, 636 So. 2d 391 (Miss. 1994). Further, anal intercourse or sodomy falls within the purview of that statute. *Miller*, supra. **The conscious of this Court is shocked by the audacity and brashness of an individual to come into court, openly and freely admit to engaging in felonious conduct on a regular basis[2] and expect the Court to find such conduct acceptable**, particularly with regards to the custody of a minor child. **The parties are not in Kansas anymore, nor are they in California.** Such conduct is only not [sic] condoned by the Mississippi legislature but is prohibited and punishable as a serious crime. Further, other statutes within this state make it clear that the legislative intent for the enforcement of the law prohibiting unnatural intercourse among other reasons, is for the protection of children. Section 43-15-6 of the Mississippi Cod Annotated (1972 as amended), prescribes that:

"No person convicted of a crime affecting children or any other crime as set forth in . . . Section 97-29-59, Mississippi Code of 1972, relating to unnatural intercourse; . . . or any other offense committed in another jurisdiction which, if committed in this state, would be deemed to be such a crime without regard to its designation elsewhere, shall be licenses as a foster parent or a foster home by the Mississippi Department of Public Welfare . . ."

Surely it cannot be argued that conviction for such which would prohibit the Plaintiff from serving as a foster parent should not likewise prohibit him form serving as a custodial parent of a child.

Additionally, Section 37-3-51 of the Mississippi Code Annotated (1972 as amended) requires that:

"Upon the conviction of any certificated personnel as defined in Section 37-19-7, employed by a public or private elementary or secondary school, of any felony, or of a sex offense as defined in subsection (2) of this section, the District Attorney or other prosecuting attorney shall identify those defendants for the Circuit Clerk. Each Circuit Clerk shall provide the State Department of Education with notice of the conviction of any such personnel of a felony or a sex offense. Sex offense shall mean any of the following offenses: . . . (h) Section 97-29-59, Mississippi Code of 1972, relating to unnatural intercourse."

Likewise, this Court recognizes the legislature intent of such a statute to be for the protection of children. It is apparent that the legislature, in enacting Section 97-25-59, Section 43-15-6 and Section 37-3-51 of the Mississippi Code did so among other purposes, for the protection of children. This Court refuses to condone, endorse, sanction or tolerate homosexual activity in any fashion, mode or manner. To do so would be to turn a blind judicial eye in the statute promulgated and enacted by the legislature which was obviously passed with the intent to protect children. **The element of morality must be resolved against the Plaintiff because of his homosexual activity which, if committed within this state would constitute felonious conduct, same as it would be resolved**

**has he openly admitted and confessed to the ongoing sale or distribution of illegal drugs. This state and particularly this Court is unwilling to accept such conduct at any time.** Indeed, the Mississippi Supreme Court in *White vs. Thompson*, 569 So. 2d 1181 (Miss. 1990), has found that such homosexual activity may well be considered in matters of child custody. (Natural mother's visitation was restricted to times and places where such visitation would occur outside the presence of her lesbian lover.) This Court is unwilling to deviate from that standard.

Opinion of the Chancery Court (emphasis added).

¶41. Our unnatural intercourse statute, about which the chancellor is so concerned, applies to both heterosexuals and homosexuals. The chancellor feels that David's sexuality is an issue of morality. David's sexual orientation, however, is an issue both of genetics and personal privacy. If sexual behavior were an issue of morality, why did not the chancellor ask Machelle, who resides in Mississippi, if she engages in heterosexual sodomy or oral intercourse? *See* Miss. Code Ann. § 97-29-29. No morality argument is relevant. If homosexuality were the accepted perspective, as it was with the Greeks, who most people deem as enlightened, would it then be fair to criticize heterosexuals on the grounds of morality? *See* Darryl Robin Wishard, Comment, ***Out of the Closet and Into the Courts: Homosexual Fathers and Child Custody***, 93 **Dick. L. Rev.** 401, 403 (1989). I think not. It appears that the chancellor and majority have created a new *Albright* factor, that of sexual orientation. Such seems contrived by the majority for the purpose of punishing David for his lifestyle, contrary to the well-established legal principle that child custody decisions are to be made in the best interests of the child and should not be used to punish one parent or the other. ***Smith v. Jones***, 654 So. 2d 480, 487 (Miss. 1995)(*quoting* ***Tucker v. Tucker***, 453 So. 2d 1294, 1297 (Miss. 1984)); ***Moak v. Moak,*** 631 So. 2d 196, 200 (Miss. 1994); ***Crowson v. Moseley***, 480 So. 2d 1150, 1152 (Miss. 1985).

¶42. Given the chancellor's concern about David's sexuality and its affect on Paul, it is unfortunate that David could not bring this case in California, where consensual oral copulation and sodomy behind closed doors are legal. *See* Cal. Penal Code §§ 286 & 288a. If the case had been so brought, David would have avoided the unfortunate and unnecessary behavior of chancery court. The chancellor cites Mississippi law not applicable to this case. *See* Miss. Code Ann. §§ 43-15-6 & 37-3-51; *see also White vs. Thompson*, 569 So. 2d 1181 (Miss. 1990). Even the majority recognizes, and reverses on, the issue that the chancellor erred by restricting, pursuant to *White*, David's visitations with Paul to times when David's life partner is not present. Further, while David's intimacies with his companion may be "illegal" in Mississippi pursuant to Miss. Code Ann. §97-29-59, they are not illegal in California and are effected in private and behind locked bedroom doors, well outside of Paul's immediate presence.

¶43. One must consider also the scholarly literature which explains that parental homosexuality is not a precursor to the child being homosexual,[(3)] even in a case such as this where the child is aware of the parent's homosexuality:

> "Every study on the subject has revealed that the incidence of same-sex orientation among the children of gays and lesbians occurs as randomly and in the same proportion as it does among children in the general population. . . ." Therefore, despite the concern of many courts about the negative influence on a child, sexual orientation, according to several studies, is developed independently of one's parents and should not be a factor in custody considerations. "Most homosexuals have had parents who are exclusively heterosexual, or primarily so." The concern of

judges that a homosexual parent will rear homosexual children is unwarranted by the evidence. Therefore the court's concern about the negative effects of exposure to a same sex relationship is ill-based.

. . . .

. . . An irrebuttable presumption really functions to penalize the parent for their sexual orientation rather than rationally evaluating and determining custody upon concrete evidence of the child's current health and stability. At least ten states have rejected presumptions against awarding custody to parents with a same sex orientation.

*See* Courtney R. Baggett, *Sexual Orientation: Should It Affect Child Custody Rulings*, 16 **Law & Psychol. Rev.** 189, 191-193 (1992)(citations omitted). The ten states cited by Baggett as rejecting per se rules against same-sex parents are Alaska, California, Indiana, New Jersey, New York, South Carolina, Vermont, Washington, West Virginia, and New Mexico. *See S.N.E. v. R.L.B.*, 699 P. 2d 875, 879 (Alaska 1985); *In re Marriage of Birdsall*, 243 Cal. Rptr. 287, 289 (Ct. App. 1988); *Nadler v. Superior Court*, 63 Cal. Rptr. 352, 354 (Ct. App. 1967); *D.H. v. J.H.*, 418 N.E. 2d 286, 293 (Ind. Ct. App. 1983); *In re J.S. & C.*, 324 A. 2d 90, 92 (N.J. Super. Ct. Ch. Div.1974), *aff'd*, 362 A.2d 54 (N.J. Super. Ct. App. Div.1976); *Guinan v. Guinan*, 477 N.Y.S. 2d 830, 831 (App. Div. 1984); *Stroman v. Williams*, 353 S.E. 2d 704, 705-06 (S.C. Ct. App. 1987); *Re: Adoptions of B.L.V.B. and E.L.V.B.,* 628 A. 2d 1271 (Vt. 1993); *In re Marriage of Cabalquinto*, 669 P. 2d 886, 888 (Wash. 1983); *Rowsey v. Rowsey*, 329 S.E. 2d 57, 60-61 (W. Va. 1985); *In re Jacinta M.*, 764 P. 2d 1327, 1330 (N.M. Ct. App. 1988). Why does Mississippi not become reasonable and follow the lead of these states? Yes, as the majority shows, Mississippi ostensibly follows the lead of the aforementioned states, but I query whether we truly do follow such leads. Do we? Given the chancellor's activities and the majority's decision in this case, I think not.

¶44. Underlying this case is the protection one is guaranteed by the Fourteenth Amendment of the United States Constitution. In a key substantive due process case which considered the right to child-rear, *__Pierce v. Society of the Sisters__, 268 U.S. 510 (1925)*, the United States Supreme Court stated that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty to recognize and prepare him for additional obligations." *__See Id__*.; *see also __Meyer v. Nebraska__, 262 U.S. 390 (1923)*; *and see __Prince v. Massachusetts__, 321 U.S. 158 (1944)*. In *Bryant v. Brown*, 151 Miss. 398, 118 So. 184 (1928), we stated that:

Primarily parents, or those standing in loco parentis to minor children, have the constitutional right, under the Fourteenth Amendment, to the custody and control of such minor children, and may give them such education and training as in their judgment may seem best for the welfare of the child and for the good of society. . . .

As long as parents properly exercise their duty, under their natural rights, to rear, educate, and control their children, their right to do so may not be interfered with solely because some other person or some other institution might be deemed better suited for that purpose. The children of the poor cannot be taken from them, and awarded to the rich or to some rich and powerful institution, merely because such person or such institution might, in the judgment of the court, do a better part by the child than the natural parents. But where the parents fail to perform their natural duty to so rear and educate the child as to make it a useful, intelligent, and moral being, but permit it to go unrestrained and to become

vicious in its habits and practices, and a menace to the rest of society, the state, as parents patriae of all children, may assert its power and apply the curative, so as to prevent injury to the child and to society by the negligent and wrongful conduct of the parents in failing to exercise the proper control and restraint over the child in its tendencies.

*See Id.*, 151 Miss. at 414-416, 118 So. at 188. Citing *Pierce*, this Court further has stated that the liberty guaranteed by the Due Process Clause "involves the power to give to children such training and education as in the parents' judgment is best for the children, so long as such training and education do not result in, or tend to develop, tendencies or traits dangerous to society." *See Sinquefield v. Valentine*, 159 Miss. 144, 151, 132 So. 81, 83 (1931).

¶45. In the instant case, Machelle and Paul's stepfather are breaching the "high duty" required by the Constitution. The chancellor and the majority are forcing Paul to reside in an unhealthy environment from which physical and psychological harm could erupt at any moment, or, at best, from which he is being taught an immoral and abusive lifestyle. Given the facts and the substantive due process requirements that parents have the right and duty to child-rear, it is only reasonable to hold that Machelle has breached her duty and squandered her right. Consider particularly Machelle's choice of "living partners"her last two marriages have been to convicted felons. David is a stable, loving parent who now wishes to fully utilize his right to child-rear, who are we to take that Constitutional right away from a capable parent? Someone might argue that regardless of the right to child-rear, ***Bowers v. Hardwick***, 478 U.S. 186 (1986), states that a homosexual has no right to commit sodomy and thus is not fit to be a father. Such an argument is dangerous and unmerited. This is not *Bowers*unlike Georgia, in California, where David is intimate with his life partner, consensual sodomy amongst adults is legal. Further, while homosexual behavior may not be a fundamental right, such realization is not even a rational basis for trumping another rightthat of child-rearing. Under the equal protection analysis of ***Romer v. Evans***, 571 U.S. 620 (1996), the chancellor's sexual-orientation based decision burdens the parental right to child-rear. The chancellor's obvious sexual-orientation based action is not rationally related to the legitimate end of considering the best interests of the child in a modification of custody. The rationale is one of homosexuality being a moral block to effective child-rearing. Such a rationale is, as explained above, at least unreasoned and at most unconscionable. As the Supreme Court stated in *Romer*: "[i]t is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit. . . ." ***See id.*** at 635. The *Romer* Court continued: "[w]e must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class a stranger to its laws." ***See id.*** Neither should Mississippi.

¶46. Paul Weigand remains in the custody of a mother who, herself, is trapped in an untenable situation that renders the boy vulnerable to both psychological and physical harm from his stepfather. What is the child being taught in this environment? He is being prepared for a lifestyle of drugs, adulterous relations, wife abuse, and child-threatening. But for the "moral" decision of the chancellor and the majority of this Court, he could be in the custody of his father in California living in a safe and stable home environment and enjoying the educational and material benefits his father desperately seeks to provide him. Accordingly, justice requires that I dissent.

**SULLIVAN, P.J., JOINS IN PART.**

# BANKS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶47. Because of the language used by the chancellor with respect to David's acknowledgment of a homosexual lifestyle, I cannot help but believe that his findings and ultimate conclusions are impermissibly infected by undue consideration of this factor. Accordingly, I dissent to so much of the majority decision as affirms the custody decision.

¶48. The chancellor's discussion of this issue is set forth in the dissent of Justice McRae, much of which I join. It is my view that a homosexual lifestyle should not ipso facto render one unfit for custody. It is apparent from that the chancellor below had a contrary view. I would reverse his decision with respect to custody and remand this matter for a new trial before a different chancellor.

¶49. Failing complete reversal, I join that portion of the majority decision which reverses the chancellor as to visitation.

**SULLIVAN, P.J., JOINS THIS OPINION.**

1. The chancellor fails to recognize that the statute applies to both heterosexuals, whether married or single, and homosexuals.

2. The chancellor directly questioned David. What was he supposed to do, perjure himself?

3. Recent studies have found that more than one-third of all adult males and nearly one-fifth of all adult females have engaged in a homosexual act to the point of orgasm. About one-tenth of all men continue to have homosexual experience after marriage. *See* J. Thomas Oldham and David S. Caudill, *A Reconnaissance of Public Policy Restrictions Upon Enforcement of Contracts Between Cohabitants*, 18 **Fam. L.Q.** 93, 141 n.162 (1984).